## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

KEVIN D. HARDWICK,

           Plaintiff,

v.

3M COMPANY, EIDP, INC, f/k/a E. I. DU
PONT DE NEMOURS AND COMPANY,
and THE CHEMOURS COMPANY,

           Defendants.

CASE NO.: 2:24-cv-3121

**CLASS ACTION COMPLAINT AND
JURY DEMAND**

Plaintiff, Kevin D. Hardwick, by his undersigned attorneys, alleges as follows:

## I.      NATURE OF THE ACTION

1.     This is a national class action brought on behalf of Plaintiff individually, and on behalf of all others similarly situated (the "Class"), for injunctive, equitable, and declaratory relief, including medical monitoring and related studies, by Plaintiff and other Class members for injuries arising from the intentional, knowing, reckless and negligent acts and omissions of Defendants in connection with contamination of the blood and bodies of Plaintiff and other Class members with two members of the family of synthetic, toxic per- and polyfluoroalkyl substances (collectively "PFAS") known as perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") (PFOA and PFOS are collectively referred to herein as "C8"), which resulted and continues to result from Defendants using Plaintiff and the other Class members as part of a massive, undisclosed human health experiment without the knowledge or consent of Plaintiff or the other Class members.

## II.    JURISDICTION AND VENUE

2.      This is a re-filed case. The original case was filed by the same Plaintiff herein against the same Defendants herein (and others) in October 2018 and captioned *Kevin D. Hardwick v. 3M Company, et al.*, S.D. Ohio Case No. 2:18-cv-1185 ("Original Case") and assigned to Judge Edmund A. Sargus, Jr. and Magistrate Judge Elizabeth A. Preston Deavers. Following full, complete briefing and oral argument on dispositive motions by the same Defendants herein, all of which were denied, and the close of class certification discovery, including the extensive, complete deposition of Plaintiff by the same Defendants herein, this Court issued an Opinion & Order on March 7, 2022, certifying Plaintiff and undersigned counsel to represent a class in the Original Case (ECF No. 233 in the Original Case). At the direction of the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"), this Court dismissed the Original Case without prejudice for lack of jurisdiction on March 11, 2024.

3.      This Court has jurisdiction over Plaintiff's re-filed case because, through the allegations in this Complaint, Plaintiff has addressed and resolved all purported traceability issues identified by the Sixth Circuit in its November 27, 2023, Opinion ordering the dismissal for lack of jurisdiction of the Original Case. The Plaintiff's blood contains the C8 manufactured by Defendants.

4.      This re-filed case does not fall within the scope of the *In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873 ("AFFF MDL"). In its February 5, 2020, Order Denying Transfer, the United States Panel on Multidistrict Litigation denied a motion by some of the defendants in the Original Case to transfer the Original Case to the AFFF MDL.

5.      This Court has jurisdiction over the subject matter of this Complaint, pursuant to 28 U.S.C. §§ 1332, 2201-02, and because it is a class action arising under the Class Action Fairness

Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a different State from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

6.     This action satisfies CAFA's jurisdictional requirements. To be clear though, Plaintiff only seeks equitable and/or injunctive relief and a declaratory judgment, as explained below.

7.     Venue is appropriate in the Southern District of Ohio (this "District") pursuant to 28 U.S.C. § 1391 and S.D. Ohio Civ. R. 3.1(b).

### III.    PARTIES

8.     Plaintiff, Kevin D. Hardwick, is a citizen of the State of Ohio and resident of the Southern District of Ohio, worked as a firefighter for more than forty years, and was exposed at home and at work to C8 through ingestion, inhalation, and absorption of C8 in air, water, food, dust, clothing, uniforms, equipment, gear, and consumer and industrial products contaminated with or otherwise containing C8, and testing has confirmed that Mr. Hardwick has more than 2 parts per billion ("ppb") C8 in his blood serum, including both liner and branched C8, confirming both electrochemical fluorination ("ECF") and telomer-based sources attributable to the Defendants herein. The C8 in his blood was manufactured by Defendants.

9.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation organized and existing under the laws of Delaware and does business throughout the United States, including conducting business in the Southern District of Ohio. 3M has its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is registered to do business in Ohio.

10. 3M was the inventor of many PFAS, including C8, and made, used, disposed, and directly discharged and released such C8 into the environment, including into Ohio and this District, from its various manufacturing facilities in the United States, including in Cottage Grove, Minnesota, Decatur, Alabama, and Cordova, Illinois, and overseas, including through direct environmental releases and discharges into air, water, and soils and disposals in landfills and wastewater systems at and associated with such manufacturing locations, in addition to distributing and directing such distribution of C8 throughout the entire United States, including into Ohio, through the manufacture, use, sale, and marketing of various products made with or contaminated with such C8, including, but not limited to, FC-143, FC-195, Scotchgard™, and Scotchban™.

11. 3M began selling C8-based Scotchgard™ products in 1956, advertising them as protection for fabrics from water damage and stains. Scotchgard™ products exposed consumers to PFOS during application and, once the treated fabrics began to degrade, through air and dust. Yet, 3M continued to market Scotchgard™ products to consumers, to misrepresent them as safe for household use, and to fail to disclose health risks. From 1970 to 2002, carpet treatments like Scotchgard™ Fabric Protector were the most common use of PFOS substances, with 48,000 tons used worldwide.

12. In the 1970s, 3M also applied Scotchban™ to consumer products like paper cups, cake mix boxes, and pet food packaging, as the grease-resistant chemicals left paper intact. 3M did not warn paper mills or other manufacturers of these products about the toxicity of PFAS, leading to the propagation of misrepresentations to consumers.

13. 3M was the original and exclusive manufacturer of C8, including both PFOS and PFOA, within the United States until it claims to have phased out production of C8 around 2002,

and was always the sole and exclusive manufacturer of all PFOS and all products containing PFOS within the United States.

14. 3M made its C8 using its own patented electrochemical fluorination process, which generated C8 with a distinct chemical signature or "fingerprint" identifiable by scientists using complex analytical techniques where branched versus linear chained C8 materials can be identified.

15. 3M is the source of all PFOS found in human blood within the United States, including in Plaintiff and all Class members, and analytical testing can confirm that 3M is the sole source of all PFOA found in human blood, including in Plaintiff and all Class members, generated from the ECF method used and patented by 3M (the "3M ECF-Made PFOA"), based on branched versus linear chain results.

16. 3M designed, manufactured, marketed, used, sold, and released C8, including in Ohio and this District, in such a way as to result in the manufacture, use, disposal, and release of various products and materials containing or contaminated with C8 across the United States, including in Ohio, resulting in the release of C8 into the air, water, and soil where such C8 then traveled through the air, water, and otherwise across the country, including into Ohio, where such C8 then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such C8, proximately resulting in the contamination of Plaintiff's and the other Class members' blood and bodies with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.

17. All of the PFOS and all of the 3M ECF-Made PFOA in the blood of Plaintiff and all Class members came from 3M and is directly traceable to 3M.The blood of Plaintiff and all Class members contain PFOS and 3M ECF-Made PFOA that came from 3M.

18.     Based on the allegations above and throughout this Complaint outlining 3M's actions in and purposefully directed toward Ohio and this District, and the harm to Plaintiff and the Class members proximately caused by 3M's conduct, this Court has personal jurisdiction over 3M.

19.     EIDP, Inc., f/k/a E. I. du Pont de Nemours & Co. ("DuPont"), is a Delaware corporation organized and existing under the laws of Delaware and does business throughout the United States, including conducting business in the Southern District of Ohio. DuPont has its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

20.     In 1945, DuPont trademarked the fluoropolymer PTFE as Teflon™, introducing it to the consumer and industrial markets shortly thereafter.

21.     Between at least 1951 and 2000, DuPont purchased PFOA (marketed as FC-143 by 3M) from 3M for use in manufacturing Teflon™ at DuPont's manufacturing facility in Washington, West Virginia (the "Washington Works Plant") where use of such FC-143 directly resulted in residual PFOA in and on consumer products like Teflon™ cookware, and resulted in the release of PFOA into the air, water, and soil from the Washington Works Plant and its associated landfills and disposal sites where such PFOA then traveled through the air, water, and otherwise into multiple states and judicial districts, including Ohio and this District, where such PFOA then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such PFOA, including Plaintiff and the Class members.

22.     PFOA also has been found in or degrading from other products made with DuPont's PTFE, such as dental floss, dental tape, and films sealants.

23.     By 1986, DuPont also was manufacturing and marketing products using other materials that were contaminated with or degraded to PFOA in the environment, such as

Stainmaster™ treatment for carpets, which DuPont marketed as especially helpful to families with small children and pets, disregarding that the Stainmaster™ Carpet increased children's exposure to PFOA residue, as children are most likely to be on or near the ground.

24.    DuPont also manufactured and marketed PTFE micropowders under the Zonyl™ brand name, beginning in the 1960s.  Zonyl™ also can break down in use or in the environment to PFOA and, according to DuPont, it fully understood that PFOA was an "unintended byproduct of the manufacturing process" of fluorotelomers like Zonyl™.

25.    Zonyl™ was used in grease-resistant, non-stick paper and cardboard consumer products like fast food packaging and microwave popcorn bags.

26.    In a 1966 Food Additive Petition to the Food and Drug Administration ("FDA"), DuPont submitted data indicating that Zonyl™ could migrate into food in concentrations that caused rats fed Zonyl™ at the FDA's required "no effect level" to suffer adverse liver reactions. After the FDA requested a longer-term health study, DuPont revised its calculations, suggested that a different compound was partially causing the toxic reaction, and got its Petition approved without submitting another study.  In 1987, DuPont confirmed that levels of Zonyl™ in food could reach three times the FDA-approved amount.

27.    By at least 1976, DuPont began marketing and selling certain textiles and materials used in clothing, uniforms, and other items, such as turnout gear or personal protective equipment, including under various brand names such as Nomex,™ that were made with, contaminated with, contained, or otherwise were a source of C8 exposure to users from the use and breakdown of such materials over time, but DuPont did not alert or warn such customers or users leading to decades of widespread use of such materials.

28.     After 3M announced in May of 2000 that it would stop making C8 (both PFOA and PFOS), DuPont, rather than switch to another material, began manufacturing its own PFOA at its facility in Fayetteville, North Carolina, and began shipping that PFOA to its Washington Works Plant where it was then used for manufacturing Teflon™ and other products and where such activities directly resulted in the release of PFOA into the air, water, and soil where such PFOA then traveled through the air, water, and otherwise into multiple states and judicial districts, including Ohio and this District, where such PFOA then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such PFOA, including Plaintiff and the Class members.

29.     In addition to the PFOA releases from its manufacturing operations at its Washington Works plant, DuPont also engaged in manufacturing, reclamation, recycling, and disposal activities at other facilities across the United States and overseas making or using PFOA in various products, including Teflon™, Zonyl™, Stainmaster™, and Nomex™, including but not limited to at its Chambers Works and Parlin Plants in New Jersey, and its manufacturing plants in Pascagoula, Mississippi, Spruance, Virginia, Dordrecht, Netherlands, Shimizu, Japan, and Fayetteville, North Carolina, and at their associated landfills and disposal/recycling/reclamation facilities, where such activities resulted in direct environmental releases and discharges of PFOA into air and water, and where such PFOA then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such PFOA, including Plaintiff and the Class members.

30.     DuPont designed, manufactured, marketed, used, sold, and released PFOA, including in Ohio and this District, in such a way as to result in manufacture, use, disposal, and release of various products and materials containing or contaminated with PFOA across the United

States, including in Ohio and this District, resulting in the release of PFOA into the air, water, and soil where such PFOA then traveled through the air, water, and otherwise across the country, including into Ohio and this District, where such PFOA then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such PFOA, resulting in the contamination of Plaintiff's and the other Class members' blood and bodies with PFOA, and the biopersistence and bioaccumulation of such PFOA in such blood and bodies.

31.     DuPont developed its own telomerization method for manufacturing PFOA and other materials that break down into, degrade to, or otherwise result in the release of PFOA, which generates PFOA with a distinct chemical signature or "fingerprint" identifiable by scientists using complex analytical techniques where branched versus linear chained C8 materials can be identified.

32.     Based on the allegations above and throughout this Complaint outlining DuPont's actions in and purposefully directed toward Ohio and this District, and the harm to Plaintiff and the Class members proximately caused by DuPont's conduct, this Court has personal jurisdiction over DuPont.

33.     Defendant The Chemours Company ("Chemours") is a Delaware corporation organized and existing under the laws of Delaware and does business throughout the United States, including conducting business in Ohio and this District. Chemours has its principal place of business located at 1007 Market Street, Wilmington, Delaware  19899.

34.     Chemours has by contract and other written instruments, or by operation of law, assumed or otherwise is responsible for DuPont's PFOA-related liabilities, including DuPont's liability for contaminating Plaintiff's and the other Class members' blood and bodies with PFOA.

35. Since its formation, Chemours has not only continued the manufacture, marketing, sale, and disposal or products and materials, such as Teflon™, Zonyl™, Nomex™, and Stainmaster™, historically made with or containing PFOA, which activities were formerly conducted by DuPont, but Chemours continues to this day to manufacture PFAS and other materials that result in the continuing release of PFOA into the environment, including into Ohio and this District, and thus lead to the inevitable contamination of human blood with PFOA, including the blood of Plaintiff and the other Class members.

36. The PFOA made or originating from products made by DuPont and Chemours using their telomerization methods can be distinguished from the PFOA made by 3M based on the distinct chemical signature or "fingerprint" identifiable by scientists using complex analytical techniques where branched versus linear chained C8 materials can be identified.

37. Accordingly, all of the PFOA containing this DuPont and Chemours-specific fingerprint in the blood of Plaintiff and all Class members came from DuPont and Chemours and is directly traceable to DuPont and Chemours. The blood of Plaintiff and all Class members contain PFOA that came from DuPont and Chemours.

38. Based on the allegations above and throughout this Complaint outlining Chemours's actions in and purposefully directed toward Ohio and this District, and the harm to Plaintiff and the Class members proximately caused by Chemours's conduct, this Court has personal jurisdiction over Chemours.

39. The C8 created by 3M, DuPont, and Chemours moves directly from environmental media (such as air, water, soil, dust) or other sources (such as clothing, food, or consumer products) into humans, including Plaintiff and the other Class members, through either direct ingestion (drinking, inhalation, or eating) or adsorption, where it then binds to human blood and stays there

10

(persists), circulates throughout the body (and all organ systems), and builds up over time (bioaccumulates), resulting in the inevitable C8 contamination of the blood of Plaintiff and the other Class members.

40.     In 2023, 3M, DuPont, and Chemours each voluntarily and knowingly entered into court-reviewed, public contracts under which they agreed to, collectively, pay up to $13.5 billion to what they identified and selected to be a nationwide class of almost every public water system across the entire United States who had any detectible amount of any PFAS, specifically including any detectible amount of either PFOA or PFOS, in their sources of public water, regardless of whether any other company or entity – located anywhere in the world – may have also ever used (or also made) any such PFAS at any location or any point in time (the "Nationwide 3M and DuPont/Chemours PFAS Class Actions").

41.     In 2024, the United States District Court for South Carolina granted final approval of the Nationwide 3M and DuPont/Chemours Class Actions and certified the cases to proceed and be resolved as nationwide class actions against 3M, DuPont, and Chemours as to any amount of C8 (including both PFOS and PFOA), without objection by 3M, DuPont, or Chemours.

## IV.     GENERAL FACTUAL ALLEGATIONS

42.     PFAS materials are a class of non-naturally-occurring, man-made chemicals that were first developed by 3M and DuPont in the late 1930s to 1940s and put into large-scale manufacture and use by such Defendants by the early 1950s.

43.     PFAS are highly fluorinated synthetic chemical compounds made up of chains of carbon atoms bonded together and to fluorine bonds through technologies and methods developed and patented by 3M and DuPont.

44.     C8 (PFOS and PFOA) is identified by having eight carbons bonded to fluorine.

45. 3M produced C8 by its own patented method of electrochemical fluorination, and DuPont later developed its own method of making C8 through a telomerization process.

46. 3M made and used C8 in the process of manufacturing various 3M products, including Scotchgard™ and Scotchban™, beginning in the late 1940s and continuing until around 2002.

47. DuPont used 3M's PFOA (marketed by 3M as FC-143) in the process of manufacturing various DuPont products, including at least Teflon™, and began making its own PFOA for use in products beginning around 2002 and continuing through at least 2013.

48. DuPont also made various products that generated or otherwise resulted in the release of PFOA into the environment and eventually led to PFOA contaminating the blood of humans, including through its telomerization process, that continued even after 2013.

49. Chemours has continued the operations and products of DuPont, including those using this same telomerization process, that result in the continuation of such release of PFOA into the environment and PFOA contamination of human blood, including from its operations and activities at its manufacturing facilities in the United States and overseas such as its facilities in Fayetteville, North Carolina, Dordrecht, Netherlands, and Washington, West Virginia.

50. The carbon-fluorine bond found in PFAS does not exist in nature, is one of the strongest bonds in chemistry, and gives PFAS their unique chemical properties.

51. By at least the end of the 1960s, 3M and DuPont were both aware that C8 is mobile and persists in the environment, meaning that, once introduced into the environment (whether through emissions, releases, or disposal into air, water, or soils), C8 will spread quickly, because of its multiple carbon-fluorine bonds, which are resistant to metabolic and environmental degradation processes.

52.     By at least 1960, 3M knew that its PFAS wastes could leach into groundwater and otherwise enter the environment, and a 3M internal memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

53.     In sworn court testimony, scientists from both 3M and DuPont also confirmed that each company has been aware since at least the end of the 1960s that, once released into the world, the C8 that they made will move rapidly through environmental media and will stay there and persist, taking thousands if not millions of years to degrade or break down under natural conditions.

54.     Likewise, both 3M and DuPont were well aware since at least the 1970s that their C8, once released into the world, will inevitably move through environmental media (air, water, or soils) to ultimately be ingested, inhaled, or otherwise absorbed into living creatures, including animals and humans where such C8 will inevitably bind to materials within the blood or serum of such living creatures, including humans, making animal and human blood the ultimately repository for C8 pollution.

55.     In fact, as early as 1956, 3M's PFAS were found to bind to proteins in human blood.

56.     3M and DuPont also have been well aware since at least the end of the 1970s that, once their C8 makes its way into human blood, the human body cannot efficiently excrete or remove this man-made chemical, so the C8 will remain and "persist" in the blood and body for long periods of time, and with each additional exposure to C8, more C8 will be added in the blood and body (i.e., bioaccumulation), leading to higher and higher levels of C8, unless all additional sources of C8 exposure are somehow eliminated.

57. Prior to commercial development and large-scale manufacture and use of C8 and other PFAS materials by 3M and DuPont, no such PFAS materials, including C8, had been found, detected, or were present in human blood.

58. All C8 now detected or present in human blood, including that found in the blood of Plaintiff and the Class members, is the direct result of these human manufacturing activities started by 3M and DuPont.

59. By at least the end of the 1960s, animal toxicity testing performed by 3M and DuPont revealed that exposure to C8 resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

60. By at least the end of the 1970s, 3M and DuPont were aware that C8 had been detected not only in the blood of workers at PFAS manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFAS manufacturing or use facilities, indicating to 3M and DuPont that continued manufacture and use of such PFAS materials would inevitably result in continued and increased levels of C8 getting into the environment and into human blood across the United States, even in areas nowhere near or associated with specific PFAS manufacturing or use facilities.

61. In 1975, 3M even acknowledged internally that there was already a "universal presence" of its C8 in blood samples taken from across the United States.

62. By 1978, studies conducted by or shared among 3M and DuPont on the effects of C8 on monkeys revealed that all monkeys had died within the first few days or weeks after being given food contaminated with C8, and showed that C8 affected the liver and gastrointestinal tract.

63.     By 1979, 3M's own data and research had confirmed C8 released from its manufacturing operations into surface waters was bioaccumulating in fish tissues.

64.     As of 1979, 3M was fully aware and understood that it was the sole manufacturer within the U.S. of the PFOS being found in the blood of workers and the general U.S. population, and understood that it was the sole manufacturer of the PFOA whose chemical signature and chain length indicated manufacture by the ECF method, as to which 3M held the patent.

65.     By at least the end of the 1980s, additional research and testing performed by or shared among 3M and DuPont indicated that PFOA had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in DuPont classifying such C8 material internally as a confirmed animal carcinogen and possible human carcinogen.

66.     It was understood by 3M and DuPont by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and it was known that such mechanism of action would not be operative or occur in humans.

67.     By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS material caused tumors and thus prevailing scientific principles of carcinogenesis classification mandated that 3M and DuPont presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

68.     By at least the end of the 1980s, additional research and testing performed by 3M and DuPont indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among their own workers

exposed to C8 but the complete set of such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

69.     By at least the end of the 1980s, 3M and DuPont understood that, not only did C8 get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, C8 had a long half-life, meaning that it would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which allowed increasing levels of the chemicals to build up and accumulate in the blood and bodies of exposed individuals over time, particularly if any level of exposure continued.

70.     By at least the end of the 1990s, additional research and testing performed by 3M and DuPont indicated that at least one C8 material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats, and that C8 had been associated with increased prostate cancer among 3M workers exposed to PFAS, and elevated kidney and other cancer rates had been documented among DuPont workers exposed to C8.

71.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS material caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS material that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

72.     In 1998, 3M's lead toxicologist on PFAS calculated a "safe" level for PFOS in human blood of 1.05 ppb, but 3M did not disclose that information to regulators, the scientific community, or the public, even though 3M was aware that the level of PFOS being found in the blood of the general population at that time was approximately 30 times higher than this "safe" level, with 3M, instead, continuing to misrepresent to regulators, the scientific community, and the

public for decades that the level of PFAS being found in the blood of the general population presented no risk.

73.     By at least 2010, additional research and testing performed by 3M and DuPont revealed multiple potential adverse health impacts among workers exposed to their C8, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which 3M and DuPont's own scientists, lawyers, and advisors recommended be studied further to assess the extent to which C8 exposures were causing those effects.

74.     By 2012, additional studies and analysis by independent scientists, known as the C8 Science Panel, of individuals exposed to PFOA in their drinking water had confirmed that human PFOA exposure was capable of causing testicular cancer, kidney cancer, ulcerative colitis, thyroid disease, preeclampsia, and high cholesterol.

75.     By the early 2020s, additional studies and research indicated that C8 was associated with an increasing number of additional adverse human health impacts, including additional types of cancer, negative impacts to the human immune system, and the potential to decrease the effectiveness of vaccines.

76.     In March 2021, in response to this information on C8 health risks finally being made available to regulatory authorities and scientists, the United States Environmental Protection Agency ("EPA") issued a final determination to classify C8 (both PFOA and PFOS) as national drinking water contaminants requiring limits under the federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f, et seq.

77.     In June 2022, EPA, following review of the latest C8 health data by its Science Advisory Board, released updated health impact summaries and evaluations/reviews for C8,

17

indicating that the maximum contaminant level goal for C8 in human drinking water should be zero and finding that C8 should be identified and classified as a likely human carcinogen.

78.     In August 2022, EPA also proposed to formally designate C8 (both PFOA and PFOS) as "hazardous substances" under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

79.     In March 2023, EPA proposed to adopt formal, enforceable maximum contaminant levels ("MCLs") for C8 in drinking water, nationwide, based on EPA's concerns over the health impacts to Americans exposed to C8.

80.     In January 2024, EPA proposed to amend its regulations promulgated under the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. to add C8 (both PFOA and PFOS) to its list of "hazardous constituents" with respect to hazardous waste management requirements.

81.     In the Spring of 2024, EPA issued its final rules formally adopting final, enforceable MCLs for C8 (both PFOA and PFOS) in drinking water, nationwide, under the SDWA and formally designating C8 (both PFOA and PFOS) as "hazardous substances" under CERCLA.

82.     The expanding awareness of the body of adverse health impact data for C8 also prompted the National Academy of Sciences to release a report in June 2022 indicating that medical monitoring would be appropriate for any person in the United States with more than 2 ppb total PFAS in their blood, with even more monitoring potentially being recommended for even more severe health impacts if total PFAS blood levels exceeded 20 ppb.

83.     In 2023, the International Agency for Research on Cancer ("IARC") released a report confirming that PFOA should be considered carcinogenic to humans and that PFOS is possibly carcinogenic to humans.

84.     In 2024, the United States Center for Disease Control ("CDC") also released guidance recommending that testing and monitoring be considered by doctors for individuals anywhere in the United States with C8 in their blood.

85.     These reports and guidance documents, along with the work and studies of the C8 Science Panel, can form a blueprint for any medical monitoring program and studies established in connection with this case.

86.     When EPA and other state and local public health agencies and officials first began learning of PFAS exposures in the United States and associated adverse health effects, 3M and DuPont repeatedly assured and represented to such entities and the public that such exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind, with Chemours continuing such misrepresentations after its formation.

87.     After EPA and other entities finally became aware of the risks of C8 and began demanding C8 manufacture and use in the United States cease, Defendants began manufacturing and using more of certain other and/or "new" PFAS materials, including PFAS materials with six or fewer carbons, such as GenX™ (collectively "Short-Chain PFAS").

88.     Defendants are each aware that one or more such Short-Chain PFAS materials also have been found in human blood or organs or may result or otherwise contribute to the presence of C8 in human blood and the human body.

89.     By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS, GenX, had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with C8.

90. As of the date this Complaint is filed, the precise mechanism(s) of action by which any PFAS causes each of the tumors found in animal studies has(ve) not been identified, mandating that Defendants each presume that any such PFAS material that caused such tumors in animal studies be presumed to present a cancer risk to exposed humans.

91. Research and testing performed by and on behalf of Defendants indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

92. Nevertheless, 3M, DuPont, and Chemours repeatedly assured and represented to governmental entities and the public (and continue to do so), including in sworn testimony before the United States Congress during hearings held in September 2019, that the presence of any PFAS materials, including these Short-Chain PFAS materials, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

93. At all relevant times, 3M, DuPont, and Chemours, individually and collectively, have had the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, or other research of any kind of the nature Defendants claim is necessary to confirm or prove that the presence of a combination of PFOA and PFOS in human blood (or C8 mixed with any one or more other PFAS) causes any disease or adverse health impact of any kind in humans, presents any risk of harm to humans, or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

94. Even after the independent science panel, known as the C8 Science Panel, publicly announced in the 2010s that human exposure to PFOA in drinking water was capable of causing

human disease, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants individually and collectively repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of any PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and any risk to humans with respect to any PFAS in human blood.

95.    At all relevant times, 3M, DuPont, and Chemours shared or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and other adverse effects and risks, including cancers.

96.    3M, DuPont, and Chemours released C8 into the environment during, as a result of, or in connection with their manufacturing, recycling, reclamation, disposal and other commercial operations, including into the air, surface waters, ground water, soils, landfills, and through their involvement and participation in the creation of consumer or other commercial products and materials, including in Ohio and this District, that 3M, DuPont, and Chemours knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiff and the other Class members to such C8.

97.    3M, DuPont and Chemours have each designed, manufactured, sold, used, and released C8 in Ohio and this District in such a way as to cause the contamination of Plaintiff's and

the Class members' blood and bodies with C8, and the resultant biopersistence and bioaccumulation of such C8 in the blood and bodies of Plaintiff and other Class members.

98.     As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and government entities has confirmed that C8 (both PFOA and PFOS) is clinically demonstrably present in approximately 99% of the current population of the United States, and has been present in such blood since at least the 1970s.

99.     There is no naturally-occurring "background," normal, or acceptable level or rate of any PFAS in human blood, including any C8, as all C8 detected and/or present in human blood in the United States is present and/or detectable in such blood as a direct and proximate result of the acts and omissions of 3M, DuPont, and Chemours.

100.     Data exists to indicate that the presence, accumulation, toxic invasion, and persistence of C8 in human blood, including that of Plaintiff and the other Class members, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and other presently-existing physical injury and/or adverse impacts to the blood and bodies of Plaintiff and the other Class members, including but not limited to subcellular injuries, including but not limited to biopersistence, cancer risk, and bioaccumulation within the body.

101.     At all relevant times, 3M, DuPont, and Chemours, through their acts and omissions, controlled, minimized, trivialized, manipulated, and otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and otherwise made available to the public relating to C8 in human blood and any alleged adverse impacts or risks associated therewith, effectively preventing Plaintiff or the Class members from discovering the existence and extent of any injuries/harm as alleged herein.

102.    At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding C8] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

103.    A former 3M scientist, Richard Purdy, wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its C8; (2) 3M's submission of misinformation about its C8 to EPA; (3) 3M's failure to disclose substantial risks associated with its C8 to EPA; (4) 3M's failure to inform the public of the widespread dispersal of its C8 in the environment and human blood; (5) 3M's production of chemicals it knew posed an ecological risk and danger to the food chain; and (6) 3M's attempts to keep its workers from discussing the problems with the company's C8 projects to prevent their discussions from being used in the legal process.

104.    In 2003, DuPont hired a consultant, The Weinberg Group, that it paid to help DuPont "shape the debate at all levels" on C8, including among scientists, law makers, regulators, the courts, the media, and the public, and to actually try to promote C8 exposure among humans as beneficial and to discredit those claiming that C8 posed risks to humans.

105.    At all relevant times, 3M, DuPont, and Chemours, through their acts and omissions, took steps to attack, challenge, discredit, and otherwise undermine any scientific studies, findings, statements, and other information that proposed, alleged, suggested, or even implied any adverse health effects or risks and any other fact of any legal, toxicological, or medical significance associated with the presence of C8 in human blood.

106.    At all relevant times, 3M, DuPont, and Chemours, through their acts and omissions, concealed and withheld information from their customers, governmental entities, and

the public that would have properly and fully alerted Plaintiff and the Class members to the legal, toxicological, medical, or other significance and risk from having C8 in their blood.

107. In 2004, EPA sued DuPont for illegally withholding information that it was required to disclose to EPA under federal law as to the substantial risk to human health and the environment from C8, ultimately resulting in DuPont paying what EPA called the "largest civil administrative penalty" in the history of the EPA.

108. In 2006, 3M also paid EPA $1.5 million for having not properly and timely disclosed to EPA substantial risk information 3M possessed on C8.

109. At all relevant times, 3M, DuPont, and Chemours encouraged the continued and even further increased use and release into the environment of C8, including into Ohio and this District, by their customers and others, by among other methods, the manufacture, use, and release of products containing or made or coated with C8, and tried to encourage and foster the increased and further use of C8, including in Ohio and this District, in connection with as many products, uses, and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

110. Once governmental entities and regulators began learning of the toxicity, persistence, and bioaccumulation concerns associated with C8 and other PFAS, Defendants cited to the pervasive use of such C8 and other PFAS throughout numerous sectors of the American economy (which they had intentionally and purposefully encouraged and created) and the widespread presence of C8 and other PFAS in the blood of Americans (which they also had negligently, recklessly, and/or intentionally caused) as an excuse not to restrict or regulate C8 and other PFAS, essentially arguing that the issues associated with C8 and other PFAS had become "too big to regulate."

111. To this day, 3M, DuPont and Chemours deny that the presence of any PFAS, including C8, in Plaintiff's or any Class member's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

112. To this day, 3M, DuPont, and Chemours deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to Plaintiff or any Class member that the presence of any PFAS material in their blood, including any C8, at any level, is of any legal, toxicological, medical, or other significance.

113. 3M, DuPont, and Chemours, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States, including C8, causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often mistakenly arguing that existing studies or data purportedly include too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

114. 3M, DuPont, and Chemours, to this day, use and rely upon what they claim is this same "lack of definitive evidence of causation" as between any PFAS, including C8, and any adverse human health effect to oppose and try to discourage regulatory and legislative efforts to limit, restrict, or address any PFAS impacts to the environment or human health, and to oppose, reject, and deny claims that any PFAS, including C8, has caused any injury or increased the risk of any adverse human health effects.

115. Yet, to this day, 3M, DuPont, and Chemours knowingly, willfully, purposefully, intentionally, recklessly, and/or negligently refuse to fund or conduct any scientific study,

research, testing, or other work of any kind that is extensive or comprehensive enough, according to Defendants, to generate results that Defendants will accept (outside the context of an existing written settlement agreement such as DuPont entered with respect to certain PFOA exposures, which created the C8 Science Panel) as sufficient to confirm a causal connection between C8 in human blood and any injury, human disease, adverse human health impact, and/or a risk sufficient to warrant any personal injury compensation or future diagnostic medical testing, including medical monitoring (hereinafter "Sufficient Results").

116. Instead, Defendants claim that they should be permitted to wait to see if and when Plaintiff or any Class member dies, develops any serious disease, adverse health effect, or risk of a nature necessitating diagnostic testing demonstrated through data Defendants believe constitutes Sufficient Results, even if that means watching, monitoring, or analyzing what happens to Plaintiff and Class members based on C8 in their blood over many years or even decades.

117. Thus, rather than fund and perform the work necessary to prove through Sufficient Results the precise nature and extent of adverse effects and risks from having C8 in human blood *before* such C8 was caused, allowed, and permitted by Defendants, through their acts and omissions, to contaminate the blood and bodies of Plaintiff and the other Class members, Defendants have used and continue to use Plaintiff and the other Class members as human guinea pigs in a decades-long experiment through which Defendants knowingly, recklessly, and/or negligently cause, allow, and permit Plaintiff and the other Class members to be contaminated with C8, allow such C8 to persist and accumulate in their blood and bodies, and then watch, record, study, assess, and monitor what happens to Plaintiff and the Class members over time as a result of the contamination, biopersistence, and bioaccumulation of C8, while arguing that Plaintiff and the other Class members have no rights to stop or address these C8 exposures until and unless *they*

can prove, at *their* cost, that such exposures have caused them a serious disease or killed them outright.

118. Plaintiff and the other Class members were not told that their blood and bodies were being contaminated with C8 or any other PFAS, nor did they consent to any such exposure or being part of any study, experiment, or other activity by or on behalf of 3M, DuPont, or Chemours that purported to associate, monitor, or evaluate whether any of their health conditions were related to C8.

119. 3M, DuPont, and Chemours knew and foresaw that their design, manufacture, sale, use, and release of C8, including in Ohio and this District, would result in the contamination of the blood and bodies of Plaintiff and the other Class members with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.

120. 3M, DuPont, and Chemours were or should have been aware, or knew /or should have known, and foresaw or should have foreseen that allowing C8 to contaminate the blood and bodies of Plaintiff and the other Class members would cause injury, irreparable harm, and unacceptable risk of such injury and irreparable harm to Plaintiff and the other Class members.

121. 3M, DuPont, and Chemours knew and foresaw that Sufficient Results did not, according to Defendants, exist before Defendants caused, allowed, and permitted C8 to contaminate the blood and bodies of Plaintiff and the other Class members.

122. 3M, DuPont, and Chemours did not seek or obtain permission or consent from Plaintiff or the other Class members before engaging in such acts and omissions that caused, allowed, and otherwise resulted in the contamination of Plaintiff's and the other Class members' blood and bodies with C8, and resulting biopersistence and bioaccumulation of such C8 in such blood and bodies.

123. 3M, DuPont, and Chemours did not seek or obtain permission or consent from Plaintiff or the other Class members before using any data relating to them in whatever studies, research, investigations, testing, and other work upon which Defendants rely to support their false claims and representations that the C8 in Plaintiff's or the other Class members' blood is purportedly insufficient to cause or increase the risk of any injury, adverse health effects, or any other effects of any legal, toxicological, medical or other significance.

124. Plaintiff and the other Class members are reasonably concerned and fearful of the effects of having C8 in their blood, including the synergistic effects of having C8 mixed with other PFAS in their blood at the same time, and what such effects will and are reasonably likely to do to them and their children, including reasonable fear of cancer and other serious disease that may have long latency periods after such exposures.

125. Plaintiff and the other Class members should not have to wait until actual diseases, death, or other adverse effects occur as a result of the PFAS in their blood and bodies before adequate testing and research is funded and performed to generate Sufficient Results upon which Plaintiff and other Class members can rely.

126. Plaintiff and the other Class members should not have to bear the burden of funding or performing such testing and research to generate Sufficient Results, which is likely to cost more than $5 million, when Plaintiff and the other Class members are not the ones who put the C8 in their blood or bodies, they did not consent or provide any permission to 3M, DuPont, and Chemours to do so (or were even aware they were being contaminated with such C8), and 3M, DuPont, and Chemours have reaped billions of dollars in profits from the acts and omissions that caused, permitted, allowed, and otherwise resulted in the C8 contamination of Plaintiff's and the

other Class members' blood and bodies and resultant biopersistence and bioaccumulation of such C8 in such blood and bodies.

127.    3M, DuPont, and Chemours are relying upon and citing the purported lack of Sufficient Results to reject, oppose, and deny any claims by Plaintiff and the Class members that they have suffered any injury or are entitled to any damages, monitoring, or other relief because of any such injury.

128.    3M, DuPont, and Chemours have more than sufficient collective assets and resources to fund a completely independent scientific process, similar to that funded by DuPont and conducted by the C8 Science Panel with respect to PFOA drinking water exposures, that all persons, including Defendants, governmental and regulatory entities, Plaintiff, Class members, the scientific community, and the public, can rely upon to provide Sufficient Results with respect to C8 in Plaintiff's and other Class members' blood and bodies, including any synergistic effects of any one C8 with other PFAS materials.

## V.    CLASS ACTION ALLEGATIONS

129.    Plaintiff incorporates all the foregoing paragraphs as though the same were set forth at length herein.

130.    Plaintiff brings this action as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1) and (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

131.    Plaintiff brings this lawsuit as a class action on behalf of the following nationwide Class, as set forth below:

> Individuals subject to the laws of Ohio, or subject to the laws of any other state that recognizes the claims for relief filed by Plaintiff, who have 2 parts per billion

29

(2 ppb) or more of PFOA and PFOS (combined) manufactured by Defendants in their blood serum.

132. Excluded from the Class are: (a) Defendants' legal representatives, employees, officers and/or directors; (b) the judge(s) to whom this case is assigned, the judge(s)'s staff, and the judge(s)'s immediate family; (c) any class counsel or their immediate family; and (d) class members who have already released their claims pertaining to the C8 that is the subject of this Complaint (as to the specific PFAS that are the subject of the release(s) and the specific parties and claims that are covered by such release(s)).

133. Plaintiff reserves the right to amend the class definition set forth above if discovery or further investigation reveals that the Class should be expanded, divided into subclasses, or modified in any way.

134. The definition of the Class is unambiguous.

135. Plaintiff is a member of the Class that he seeks to represent.

136. Class members are so numerous that individual joinder is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear the number greatly exceeds the number to make joinder possible, particularly given the widespread nature of C8 contamination in human blood samples collected from throughout the United States on multiple occasions.

137. The resolution of the claims of Class members in a single action will provide substantial benefits to all parties and the Court.

138. Plaintiff's claims are typical of the claims of all the members of the proposed Class. Like all proposed Class members, Plaintiff has 2 ppb or more of C8 (PFOA and PFOS combined) manufactured by Defendants in his blood serum and is subject to the laws of a state, such as Ohio, that recognizes the claims for relief filed herein by Plaintiff.

139.     Moreover, the factual bases of Defendants' acts and omissions are common to all members of the proposed Class.

140.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.

141.     Plaintiff has retained counsel with substantial experience litigating environmental torts, and specifically environmental torts involving C8 and other PFAS, as well as class actions.

142.     Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

      a.     Whether Defendants owed a duty to Plaintiff and members of the Class to refrain from acts and omissions reasonably likely to result in C8 in the blood of Plaintiff and the members of the Class, and the biopersistence and bioaccumulation of such C8 in such serum;

      b.     Whether Defendants knew, foresaw, anticipated or should have known, anticipated, and foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in the presence, persistence, and accumulation of C8 in the blood and bodies of humans;

      c.     Whether Defendants knew, anticipated, foresaw, or should have known, anticipated, and foresaw that their acts and/or omissions were likely to result in Plaintiff and the Class members having persistent and accumulating C8 in their blood and bodies;

      d.     Whether Defendants' acts and omissions proximately caused C8 to contaminate, persist in, and accumulate in the blood and bodies of Plaintiff and the Class members;

e.      Whether the presence, persistence, and accumulation of C8 in Plaintiff's and the Class members' blood and bodies and the resultant subcellular or other impact or effect, is injurious, offensive, or otherwise harmful to Plaintiff and the Class members;

f.      Whether Defendants' conduct is resulting in irreparable harm to Plaintiff and the Class members;

g.      Whether Defendants' conduct warrants injunctive and/or declaratory relief; and

h.      Whether a reasonable physician would recommend medical monitoring or other testing or studies under the circumstances.

143.    Plaintiff and members of the Class all have 2 ppb or more of C8 (PFOA and PFOS combined) from 3M and DuPont, and Chemours in their serum bloodstream and are subject to the laws of a state that recognizes the claims for relief filed herein by Plaintiff. A class action is superior to other methods for the fair and efficient adjudication of this controversy.

144.    Absent a class action, most Class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law.

145.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

146.    Whether or not Plaintiff proves which particular Defendant produced the C8 that contaminated, infiltrated, persists in, and accumulated in Plaintiff's and other Class members' blood and bodies, 3M, DuPont, and Chemours will be liable to Plaintiff and the Class members, based on theories of alternative liability or market share liability, because they designed, manufactured, sold, used, and released the C8 that is the subject of this Complaint, including in

Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other Class members' blood and bodies with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
#### (Negligence)

147.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

148.    3M, DuPont, and Chemours each had a duty to exercise reasonable care in their design, manufacture, sale, use, release, and disposal of C8, including a duty of care to ensure that C8 did not infiltrate, persist in, and accumulate in the blood or bodies of Plaintiff and members of the proposed Class.

149.    3M, DuPont, and Chemours each owed a duty of care to Plaintiff and members of the proposed Class that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, carcinogenic, and bio-accumulative nature of C8.

150.    3M, Dupont, and Chemours each failed to exercise ordinary care by acts and omissions that permitted, allowed, and otherwise resulted in the contamination of, persistence in, and accumulation in the blood and bodies of Plaintiff and the other Class members with C8, including all such acts and omissions referenced in this Complaint, resulting in Plaintiff and the other members of the proposed Class having 2 ppb or more of PFOA and PFOS (combined) in their blood.

151.    3M, DuPont, and Chemours each knew, foresaw, anticipated, and should have foreseen, anticipated, and known that the design, manufacture, sale, use, release, and disposal of PFAS and other acts and omissions as described in this Complaint would likely result in the C8

contamination of the blood and bodies of Plaintiff and the proposed Class members and its persistence and accumulation in such blood and bodies.

152.     Despite knowing, anticipating, and foreseeing the bio-persistent, bio-accumulative, toxic, carcinogenic, and otherwise harmful and injurious nature of C8, 3M, DuPont, and Chemours, and each of their agents, servants, and employees, committed negligent acts and omissions that resulted in the contamination of the blood and bodies of Plaintiff and the other Class members with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.

153.     3M, DuPont, and Chemours, through their acts and omissions as described in this Complaint, each breached their duty to Plaintiff and the members of the proposed Class.

154.     It was reasonably foreseeable to 3M, DuPont, and Chemours that Plaintiff, and the members of the proposed Class, would likely suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

155.     But for the negligent acts and omissions of 3M, DuPont, and Chemours, Plaintiff and members of the proposed Class would not have been injured or harmed.

156.     The negligent conduct of 3M, DuPont, and Chemours was the direct and proximate cause of the injuries and harm to Plaintiff and the Class members, as described herein.

## SECOND CLAIM FOR RELIEF
### (Battery)

157.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

158.     At all relevant times, 3M, DuPont, and Chemours possessed knowledge that the C8 which they designed, manufactured, sold, used, released, and disposed of were bio-persistent, bio-

accumulative, toxic, potentially carcinogenic, and otherwise harmful/injurious and that their continued design, manufacture, sale, use, release, and disposal of C8 would result in Plaintiff and the other Class members having C8 in their blood, and the biopersistence and bioaccumulation of such C8 in such blood.

159.    However, despite possessing such knowledge, 3M, DuPont, and Chemours each knowingly, purposefully, and intentionally continued to engage in such acts and omissions, including but not limited to all such acts and omissions described in this Complaint, that continued to result in Plaintiff and the other Class members accumulating C8 in their blood and bodies, and such C8 persisting and accumulating in such blood and bodies.

160.    3M, DuPont, and Chemours did not seek or obtain permission or consent from Plaintiff or Class members to put or allow C8 into their blood or bodies, or to allow C8 to persist in or accumulate in their blood or bodies.

161.    Entry into, persistence in, and accumulation of such C8 in Plaintiff's and the other Class members' bodies and blood without permission or consent is an unlawful, harmful, and offensive physical invasion and contact with Plaintiff's and the other Class members' persons and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's and the other Class members' blood and bodies.

162.    At all relevant times, the C8 present in the blood and bodies of Plaintiff and the other Class members originated from the acts and omissions of 3M, DuPont, and Chemours.

163.    3M, DuPont, and Chemours continue to knowingly, intentionally, and purposefully engage in acts and omissions that result in the unlawful and unconsented-to physical invasion and contact with Plaintiff and the other Class members that results in persisting and accumulating levels of C8 in their blood and bodies.

164.    Plaintiff, the Class members, and any reasonable person find the contact at issue harmful and offensive.

165.    3M, DuPont, and Chemours acted intentionally with the knowledge and belief that the contact, presence, and invasion of C8 with, onto, and into Plaintiff's and the other Class members' bodies and blood serum, including its persistence and accumulation in such serum, was substantially certain to result from those very acts and omissions.

166.    The intentional acts and omissions of 3M, DuPont, and Chemours resulted directly and indirectly in harmful contact with Plaintiff's and the Class members' blood and bodies.

167.    The continued presence, persistence, and accumulation of C8 in the blood and bodies of Plaintiff and the other Class members is offensive, unreasonable, and harmful, and constitutes a battery.

168.    The presence of C8 in the blood and bodies of Plaintiff and the other Class members has altered the structure and function of such blood and body parts.

169.    As a direct and proximate result of the foregoing acts and omissions of 3M, DuPont, and Chemours, Plaintiff and the other Class members suffered and continue to suffer physical injury for which 3M, DuPont, and Chemours are therefore liable.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment under the Declaratory Judgment Act)

170.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

171.    An actual, substantial, and justiciable controversy has arisen and exists between Plaintiff and members of the Class on the one hand, and 3M, DuPont, and Chemours, on the other hand, and their respective rights, obligations, and duties with respect to Defendants' contamination

of the blood and bodies of Plaintiff and the other Class members with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.

172.    By reason of the foregoing, Plaintiff and the other Class members seek a declaratory judgment against 3M, DuPont, and Chemours that they are liable and responsible for the C8 in Plaintiff's and the Class members' blood and bodies and all equitable and injunctive relief, and such other relief as the Court may order, that the Court deems reasonable and appropriate in relation thereto.

173.    Plaintiff seeks a declaratory judgment as a form of relief even if declaratory judgment is not cognizable as a standalone cause of action.

## FOURTH CLAIM FOR RELIEF
### (Conspiracy)

174.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

175.    3M, DuPont, and Chemours maliciously conspired among each other and with consulting firms, agents, law firms, lawyers, representatives, and others and through forming joint task forces, committees, coalitions, trade groups, and councils and otherwise colluding through unlawful, affirmative misrepresentations and unlawful concealment of material facts regarding C8, including but not limited to each such act and omission described in this Complaint, to illegally and wrongfully create and perpetuate a market for C8, increase exposures to C8, produce profits for C8, conceal, misrepresent, and mislead as to the dangers and toxicity associated with C8 and Defendants' responsibility for such materials in blood and bodies, and conduct other operations and activities in a manner as to illegally and wrongfully cause, permit, and allow C8 to contaminate the blood and bodies of Plaintiff and the other Class members by illegally and wrongfully using, creating, and collecting data related to C8 exposure among Plaintiff and other Class members in

experiments, studies, research, and other scientific inquires without the consent, knowledge, permission, and awareness of Plaintiff and such other Class members, and also by illegally and wrongfully avoiding properly notifying the public or government officials of the ongoing release and continuing exposure of C8 into the environment, and illegally and wrongfully avoiding correcting, clarifying, rescinding, and qualifying their misrepresentations to Plaintiff and other Class members regarding C8 and that Defendants' acts and omissions were purportedly not causing any physical harm, injury of any kind, or damage.

176.     The purpose and result of this conspiracy by and among 3M, DuPont, and Chemours and their co-conspirators was to wrongfully and unlawfully hide the illegal and unlawful acts and omissions of 3M, DuPont, and Chemours that resulted in the contamination of the blood and bodies of Plaintiff and the other Class members, to improperly minimize, trivialize, and misrepresent the actual harm and risks of exposure to C8, to wrongfully and unlawfully deceive Plaintiff and other Class members into believing that C8 was safe, to avoid lost profits and other economic harm to 3M, DuPont, and Chemours, and to mislead and deceive as to the nature of C8 and who is responsible for its presence in human blood and bodies, leading to unnecessary and improper delay of relief to Plaintiff and the Class members.

177.     The conspiracy of 3M, DuPont, and Chemours and their co-conspirators and the wrongful and unlawful acts in furtherance of this conspiracy directly and proximately induced justified reliance by Plaintiff and other Class members, which directly and proximately caused the contamination of the blood and bodies of Plaintiff and the other Class members with C8.

178.     At the time 3M, DuPont, and Chemours and their co-conspirators made their misrepresentations, they knew of the health hazards and other risks posed by C8 to Plaintiff and the Class members.

179.    There was great likelihood and/or certainty that serious harm would arise from the misconduct of 3M, DuPont, and Chemours and their co-conspirators' misconduct; 3M, DuPont, and Chemours were aware of the likelihood of such harm; 3M, DuPont, and Chemours made profits from their and their co-conspirators' misconduct; and 3M, DuPont, and Chemours made no effort to disclose or remedy their C8 pollution, their responsibility for such contamination, or the impact of such pollution after discovery of their and their co-conspirators' misconduct.

## VII.    RELIEF SOUGHT BY THE CLASS

180.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

181.    Plaintiff and the members of the proposed Class have sustained and will continue to sustain presently existing physical injury and irreparable harm in the form of  2 ppb or more of C8 being present, accumulating, and persisting in their blood and its associated health risks, as a result of the acts and omissions of 3M, DuPont, and Chemours.

182.    As a result, Plaintiff and the members of the proposed Class seek equitable and/or injunctive relief, including but not limited to medical monitoring and associated research and studies, for each of the causes of action alleged herein; neither Plaintiff nor the Class are seeking any compensatory damages for personal injuries through any class-wide claims asserted herein.

183.    In particular, Plaintiff and the members of the proposed Class seek the establishment of a medical monitoring program for C8 blood exposure that would include diagnostic testing and studies overseen by a court-appointed panel of independent scientists, including but not limited to epidemiologists, toxicologists, medical doctors, and/or exposure-risk assessors, to be jointly selected by the parties (the "Science Panel") and tasked with independently studying, evaluating, reviewing, identifying, publishing, and notifying/informing the Class of

Sufficient Results, which work, including but not limited to any testing, sampling, studies, or monitoring deemed appropriate by the Science Panel for Class member blood contamination with C8 or C8 mixed with other PFAS (hereinafter "Science Panel Work") shall all be funded by Defendants.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

(a)    an order certifying the proposed Class, designating Plaintiff as the named representative of the proposed Class, and designating undersigned counsel as Class Counsel;

(b)    an order finding Defendants liable for negligence in the manner described herein;

(c)    an order finding Defendants liable for battery in the manner described herein;

(d)    an order finding Defendants liable for conspiracy in the manner described herein;

(e)    a declaratory judgment declaring and finding Defendants liable for the injuries and equitable/injunctive relief described herein;

(f)    equitable relief and/or an injunction ordering Defendants to provide for and fund the medical monitoring program and related Science Panel Work and studies described herein;

(g)    an award of attorneys' fees and costs, as permitted by law;

(h)    an award of pre-judgment and post-judgment interest, as provided by law;

(i)    leave to amend this Complaint to conform to the evidence produced at trial; and

(j)    such other relief as may be appropriate under the circumstances and/or permitted by law and/or equity, or as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated:  June 5, 2024                                        Respectfully submitted,

                                                           */s/ David J. Butler*
                                                           David J. Butler (0068455), Trial Attorney
                                                           Jonathan N. Olivito (0092169)
                                                           Taft Stettinius & Hollister LLP
                                                           41 S. High Street, Suite 1800
                                                           Columbus, Ohio 43215
                                                           Telephone: (614) 221-2838
                                                           Facsimile: (614) 221-2007
                                                           dbutler@taftlaw.com
                                                           jolivito@taftlaw.com

                                                           Robert A. Bilott (0046854)
                                                           Taft Stettinius & Hollister LLP
                                                           425 Walnut Street, Suite 1800
                                                           Cincinnati, OH 45202-3957
                                                           Telephone: (513) 381-2838
                                                           Facsimile: (513) 381-0205
                                                           bilott@taftlaw.com

                                                               -and-

                                                           Gary Douglas (pro hac vice application
                                                           forthcoming)
                                                           Rebecca G. Newman (pro hac vice
                                                           application forthcoming)
                                                           Douglas & London, PC
                                                           59 Maiden Lane, 6th Floor
                                                           New York, NY 10038
                                                           Telephone: (212) 566-7500
                                                           Facsimile: (212) 566-7501
                                                           gdouglas@douglasandlondon.com
                                                           rnewman@douglasandlondon.com

                                                               -and-

                                                           Ned McWilliams (pro hac vice application
                                                           forthcoming)

Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr Mougey P.A.
316 South Baylen Street
Pensacola, FL 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

*Attorneys for Plaintiff*