UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN D. HARDWICK,

      Plaintiff,

      v.

3M COMPANY, *et al.*,

      Defendants.

        **Case No. 2:24-cv-3121**
        **Judge Edmund A. Sargus, Jr.**
        **Magistrate Judge S. Courter M. Shimeall**

## OPINION AND ORDER

This matter is before the Court on a Joint Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (ECF Nos. 31, 32) by Defendants 3M Company, EIDP, Inc., f/k/a E. I. du Pont de Nemours & Co. ("DuPont"), and Chemours Company. Plaintiff Kevin D. Hardwick responded (ECF No. 36), and Defendants replied (ECF Nos. 43, 44). Also before the Court is Defendants' Unopposed Motion for Leave to File *Instanter* Notice of Supplemental Authority. (ECF No. 53.)

Defendants' Unopposed Motion for Leave (ECF No. 53) is **GRANTED**. Defendants' Rule 12(b)(1) Motion to Dismiss is **DENIED** (ECF No. 31) and Defendants' Rule 12(b)(6) Motion to Dismiss is **HELD IN ABEYANCE** (ECF No. 31). In addition, the Court certifies this matter for interlocutory review and stays this matter pending disposition of this certification and appeal.

## BACKGROUND

Mr. Hardwick brings this putative nationwide or Ohio class action for injunctive, equitable, and declaratory relief, including medical monitoring. (Compl., ECF No. 1, ¶ 1.) He alleges his injuries, and the injuries of the putative class members, arise from:

the intentional, knowing, reckless and negligent acts and omissions of Defendants in connection with contamination of the blood and bodies of Plaintiff and other Class members with two members of the family of synthetic, toxic per- and polyfluoroalkyl substances (collectively "PFAS") known as perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") (PFOA and PFOS are collectively referred to herein as "C8"), which resulted and continues to result from Defendants using Plaintiff and the other Class members as part of a massive, undisclosed human health experiment without the knowledge or consent of Plaintiff or the other Class members.

(*Id.*)[1]

Mr. Hardwick's case, as he explains, is a re-filed case. (Compl., ¶ 2); *see Kevin D. Hardwick v. 3M Co., et al.*, S.D. Ohio Case No. 2:18-cv-1185 ("*Hardwick I*"). This case has a storied past, which the Court describes below.

## I.    Alleged Facts

Mr. Hardwick is a citizen of Ohio and a resident of the Southern District of Ohio. (Compl., ¶ 8.) He has worked as a firefighter for more than 40 years. (*Id.*) Mr. Hardwick alleges that he "was exposed at home and at work to C8 through ingestion, inhalation, and absorption of C8 in air, water, food, dust, clothing, uniforms, equipment, gear, and consumer and industrial products contaminated with or otherwise containing C8." (*Id.*) Mr. Hardwick states that testing has confirmed he has more than 2 parts per billion ("ppb") C8 in his blood serum. (*Id.*) He alleges Defendants manufactured the C8 in his blood. (*Id.*)

Mr. Hardwick includes allegations specific to each Defendant. The Court summarizes those allegations in the subsections below.

---

[1] Defendants assert that the Complaint improperly lumps together PFOA and PFOS under the term "C8." (Mot., ECF No. 32, PageID 604 n.1.) But Defendants, "[f]or purposes of this Motion only, . . . use the term C8 consistent with the Complaint's definition of the term" without conceding "PFOA and PFOS are properly characterized as the same chemical." (*Id.*) The Court therefore uses the term "C8" too.

### A. 3M

Mr. Hardwick asserts that Defendant 3M Company was the inventor of many PFAS, including C8. (Compl., ¶ 10.) 3M "made, used, disposed, and directly discharged and released C8 into the environment, including in Ohio and this District." (*Id.*) 3M did so, the Complaint alleges, through putting C8 directly into the air, water, and soil and through selling products containing C8, "including, but not limited to, FC-143, FC-195, Scotchgard ™, and Scotchban.™"(*Id.*) The Complaint provides a history of 3M's manufacturing, use, sale, and marketing of C8-based products. (*Id.* ¶¶ 10–12.) Mr. Hardwick alleges that "3M was the original and exclusive manufacturer of C8, including both PFOS and PFOA, within the United States until it claims to have phased out production of C8 around 2002." (*Id.* ¶ 13.)

Mr. Hardwick alleges that "3M is the source of all PFOS found in human blood within the United States," including in the blood of Mr. Hardwick and the putative class members. (*Id.* ¶ 15.) "[A]nalytical testing can confirm that 3M is the sole source of all PFOA found in human blood, including in Plaintiff and all [putative] Class members, generated from the ECF method used and patented by 3M (the '3M ECF-Made PFOA')." (*Id.*) Mr. Harwick alleges the PFOS and 3M ECF-Made PFOA in his blood is directly traceable to 3M and came from 3M. (*Id.* ¶ 17.)

### B. DuPont

As for DuPont, Mr. Hardwick describes how DuPont trademarked fluoropolymer polytetrafluoroethylene ("PTFE") as Teflon™ and introduced it to the market. (Compl., ¶¶ 19–20.) From 1951 until 2000 DuPont manufactured Teflon™ at its manufacturing facility in Washington, West Virginia (the "Washington Works Plant"), and used PFOA that it had purchased from 3M to do so. (*Id.* ¶ 21.) This manufacturing process resulted in residual PFOA in and on consumer products and the release of PFOA into the air, water, and soil. (*Id.*) PFOA

traveled through the air and water to other states—including Ohio and this District—where it was "either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans," including Mr. Hardwick and the putative class members. (*Id.*)

There are many other products that DuPont made with PTFE and that "PFOA also has been found in or degrading from." (*Id.* ¶¶ 22, 23.) Mr. Hardwick explains that DuPont also "manufactured and marketed PTFE micropowders under the Zonyl™ brand name, beginning in the 1960s," and that product "was used in grease-resistant, non-stick paper and cardboard consumer products like fast food packaging and microwave popcorn bags." (*Id.* ¶¶ 24–25.)

### C. Chemours

As for Defendant Chemours, the Complaint explains that it is a corporation that "has by contract and other written instruments, or by operation of law, assumed or otherwise is responsible for DuPont's PFOA-related liabilities." (Compl., ¶ 34.) Mr. Hardwick's Complaint alleges that Chemours has continued manufacturing, marketing, selling, and disposing of products and materials like Teflon™, Zonyl™, Nomex™, and Stainmaster™, which historically were made with or contained PFOA. (*Id.* ¶ 35.) "[T]o this day," Chemours "manufactures PFAS and other materials that result in continuing release of PFOA into the environment" and end up contaminating the blood of Mr. Hardwick and other putative class members. (*Id.*)

Mr. Hardwick explains that the PFOA from DuPont and Chemours products can be distinguished from PFOA made by 3M based on a "distinct chemical signature or 'fingerprint' identifiable by scientists using complex and analytical techniques where branched versus linear chained C8 materials can be identified." (*Id.* ¶ 36.) This fingerprint allows Mr. Hardwick to trace the PFOA from DuPont and Chemours to his blood and the blood of putative class members. (*Id.* ¶ 37.)

4

## D.  The History of C8

Mr. Hardwick's Complaint contains a thorough history of C8, beginning in the late 1930s through present day. (Compl., ¶¶ 42–128.) While the historical allegations provide helpful context to Mr. Hardwick's Complaint, it is unnecessary for this Court's purposes to summarize the complete history.

It suffices to say that the Complaint alleges that PFAS are "a class of non-naturally-occurring, man-made chemicals" (*id.* ¶ 42), and by at least the end of the 1960s, 3M and DuPont were aware that C8 is "mobile and persists" which meant that once it is introduced into the environment—through emissions, releases, or disposal into the air, water, or soils—it spreads quicky and is resistant to metabolic and environmental degradation processes (*id.* ¶ 51). And by the 1970s, Mr. Hardwick alleges, 3M and DuPont were aware that once C8 was in the world and moving through environmental media, C8 would be "ingested, inhaled, or otherwise absorbed into living creatures," bind to materials within blood, and bioaccumulate. (*Id.* ¶¶ 54, 55.) By the late 1990s, 3M's and DuPont's research and testing indicated that PFOA has caused a "a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats." (*Id.* ¶ 70.) They also knew that C8 had been associated with increased prostate cancer among 3M workers exposed to PFAS, as well as elevated kidney and other cancer rates. (*Id.*)

The Complaint describes the additional potential adverse health impacts for those exposed to C8. (*Id.* ¶¶ 71–75.) It describes the various classification determinations of and regulations on C8 that the United States Environmental Protection Agency ("EPA") made in the 2020s. (*Id.* ¶¶ 76–81.) Mr. Hardwick explains that the National Academy of Sciences "release[d] a report in June 2022 indicating that medical monitoring would be appropriate for any person in the United States with more than 2 ppb total PFAS in their blood." (*Id.* ¶ 82.) He notes too that as

of present day, "blood serum testing and analysis by Defendants, independent scientific researchers, and government entities has confirmed that C8 (both PFOA and PFOS) is clinically demonstrably present in approximately 99% of the current population of the United States" and "has been present in such blood since at least the 1970s." (*Id.* ¶ 98.)

### E.  Class Allegations, Claims, and Prayer for Relief

The Complaint contains class action allegations. Mr. Hardwick seeks to bring his lawsuit on behalf of the following class: "Individuals subject to the laws of Ohio, or subject to the laws of any other state that recognizes the claims for relief filed by Plaintiff, who have 2 parts per billion (2 ppb) or more of PFOA and PFOS (combined) manufactured by Defendants in their blood serum." (Compl., ¶¶ 129–46.)

Mr. Hardwick brings the following causes of action: (1) negligence, (2) battery, (3) declaratory judgment under the Declaratory Judgment Act, and (4) conspiracy. (*Id.* ¶¶ 147–79.) As for relief requested, Mr. Hardwick and the putative class seek "equitable and/or injunctive relief, including but not limited to medical monitoring and associated research and studies, for each of the causes of action alleged herein." (*Id.* ¶ 182.) He clarifies that neither he nor the class seeks any compensatory damages. (*Id.*) The medical monitoring they seek would include "diagnostic testing and studies overseen by a court-appointed panel of independent scientists," who would be tasked with the following:

> [I]ndependently studying, evaluating, reviewing, identifying, publishing, and notifying/informing the Class of Sufficient Results, which work, including but not limited to any testing, sampling, studies, or monitoring deemed appropriate by the Science Panel for Class member blood contamination with C8 or C8 mixed with other PFAS (hereinafter "Science Panel Work") [to be] funded by Defendants.

(*Id.* ¶ 183.) Mr. Hardwick's defines "Sufficient Results" in paragraph 115:

> Yet, to this day, 3M, DuPont, and Chemours knowingly, willfully, purposefully,

6

intentionally, recklessly, and/or negligently refuse to fund or conduct any scientific study research, testing, or other work of any kind that is extensive or comprehensive enough, according to Defendants, to generate results that Defendants will accept (outside the context of an existing written settlement agreement such as DuPont entered with respect to certain PFOA exposures, which created the C8 Science Panel) as sufficient to confirm a causal connection between C8 in human blood and any injury, human disease, adverse human health impact, and/or a risk sufficient to warrant any personal injury compensation or future diagnostic medical testing, including medical monitoring (hereinafter "Sufficient Results").

(*Id.* ¶ 115.) Next, the Court turns to the procedural history of this litigation.

## II.     Procedural History

Mr. Hardwick's original case, *Hardwick I*, was filed in October 2018 against the same Defendants (and others). (*Hardwick I*, ECF No. 1.) Among other motion practice and court orders, that case went through briefing and oral argument on motions to dismiss, which were denied, and the close of class certification discovery. (*See, e.g.*, *Hardwick I*, ECF Nos. 127, 128.) The Court certified Mr. Hardwick and the same plaintiff's counsel in this case to represent a class comprised of "[i]ndividuals subject to the laws of Ohio, who have 0.05 parts per trillion (ppt) of PFOA (C-8) and at least 0.05 ppt of any other PFAS in their blood serum." (*Hardwick I*, ECF No. 233.) This Court reasoned that certification only as to Ohio was an appropriate first step because it was "not inclined to consider a nationwide class with individuals injured in states that do not recognize the type injury afflicting Mr.  Hardwick." *Hardwick v. 3M Co.*, 589 F. Supp. 3d 832, 851 (S.D. Ohio 2022), *vacated and remanded sub nom. In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315 (6th Cir. 2023).

Shortly thereafter, the defendants in *Hardwick I* filed a request for an interlocutory appeal with the United States Court of Appeals for the Sixth Circuit. (ECF No. 237.) About six months later, the Sixth Circuit granted that request. *In re E.I. DuPont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 22-0305, 2022 WL 4149090 (6th Cir. Sept. 9, 2022) ("23(f) Order").

### A.  The 23(f) Order

The Circuit Court explained that it granted the *Hardwick I* defendants' petition for interlocutory review because it found that this Court's certification decision "involve[d] important and unsettled questions of law and that it could prove the death knell of the litigation." *Id.* at *1. The Sixth Circuit characterized Mr. Harwick's case in *Hardwick I* as follows:

> Hardwick alleges he has PFAS in his blood. But he admits "he has 'no idea' which Defendant (if any) exposed him to PFAS." And he claims no health condition as a result of his exposure. He instead asserts that he faces an "associated *risk* of developing various diseases" later on. But how much of a risk he doesn't know. Indeed, that is the point of this lawsuit. Hardwick (and class counsel) want an injunction from the district court requiring defendants to fund a "science panel" to study whether exposure to PFAS is harmful and, if so, the degree of exposure required to cause health complications. Class counsel also seek medical monitoring for Hardwick and every other member of the proposed class—any resident of the United States "with 0.05 parts per trillion (ppt) or more of PFOA and at least 0.05 ppt or more of any other PFAS chemical in their blood serum." As defendants point out (and plaintiffs do not contest) this class would include over 330 million Americans.

*Id.* at *2 (footnotes omitted). After noting its broad discretion to determine whether to permit an interlocutory appeal under Rule 23(f), the Circuit Court discussed whether Mr. Hardwick had standing. *Id.* at *3–4.

#### i.    Standing

The Sixth Circuit considered "whether Hardwick illustrated (1) an injury in fact that [was] concrete and particularized and actual or imminent (rather than conjectural or hypothetical), (2) whether the injury [could] be fairly traced to defendants, and (3) whether the injury would likely be redressed by a decision in Hardwick's favor." 23(f) Order at *4 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

As for injury in fact, the Sixth Circuit noted that Mr. Hardwick considered his injury in fact to be both (1) the presence of PFAS in his blood, and (2) the allegedly increased risk of

8

disease PFAS inflicts. *Id.* The Circuit Court then explained that the "presence of PFAS in Mr. Hardwick's blood may potentially qualify as an Article III injury in fact—but not for the reasons the district court suggested." *Id.* The Sixth Circuit explained that this Court's conclusions that (1) Ohio law permits medical monitoring claims without proof of physical injury, and (2) that the Circuit's decision in *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011) was on point and binding as to whether Mr. Hardwick alleged an injury in fact, were both "open to doubt." *Id.*

Starting with *Hirsch*, the Circuit Court characterized its decision as never resolving or discussing "whether the plaintiffs' exposure to toxic fumes constituted an Article III injury in fact." *Id.* (citing *Hirsch*, 656 F.3d 359). Rather, it characterized *Hirsch* as affirming "the district court's grant of summary judgment to the defendants on the ground that the exposure so minutely increased the plaintiffs' risk of disease that no reasonable physician would order medical monitoring under the circumstances." *Id.* (citing *Hirsch*, 656 F.3d at 364). The Sixth Circuit found it was "unclear" why *Hirsch* would be binding or on point. *Id.*

As for (1), the Sixth Circuit confined the probative value of "Ohio's recognition of a cause of action for medical-monitoring claims after exposure to toxic substance" as to the existence of an injury in fact. *Id.* at *5. The Circuit Court explained that the legislature's recognition of a cause of action is not itself dispositive that the asserted injury is cognizable under Article III. *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016).) An "independent inquiry" must be taken, and Mr. Hardwick may have satisfied that showing by analogizing his claim to battery, providing a common-law analogue for his asserted injury. *Id.* ("After all, the common law arguably regarded even minor intrusions as cognizable.") (citing *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 693 (5th Cir. 2021)).

Even so, the Sixth Circuit said that Mr. Hardwick would next run into redressability

9

problems because medical monitoring cannot do anything about the presence of PFAS in his blood. *Id.* Such monitoring would not eliminate PFAS from his blood or prevent PFAS from entering his blood again. *Id.* "So if Hardwick's injury is understood as being the mere presence of PFAS, it is questionable whether either aspect of his requested relief would likely redress his asserted injury." *Id.*

As for Mr. Hardwick's claim that PFAS in his blood increases the likelihood he will develop certain disease, the Sixth Circuit identified a tension between the standing doctrine's "concrete-harm requirement" (mandating that the risk of harm bet both imminent and substantial) and his requested remedy to determine whether he has an elevated risk of disease. *Id.* at *6. Put differently, the Circuit Court noted the "circular nature" of Mr. Hardwick argument— "he claims to be sufficiently likely to develop a disease to have Article III standing, but because he actually has no idea about his risk of future disease, he wants an injunction creating a science panel to tell him if he's at risk of developing a disease." *Id.*

Based on its preliminary review, the Sixth Circuit also found Mr. Hardwick "[came] up short" when it came to traceability, too, because he did not know which defendant exposed him to PFAS. *Id.*

### ii. Other Findings

The Sixth Circuit observed challenges with respect to class cohesion and specificity of relief—it was suspect whether plaintiffs had "common answers," and plaintiffs were challenged to show that the class was cohesive and specificity of the requested relief. 23(f) Order at *7–9. The Circuit Court also found that this case presented a "reverse death knell" scenario in that the certification decision threatened "such massive liability that it induces defendants to settle rather than defend the action on the merits." *Id.* at *9. Finally, considering the posture of the case, the

Sixth Circuit found that this Court's statement that it might revisit its class certification decision and expand the class underscored the need for a second look. *Id.* at \*10. The Circuit Court found further review was warranted.

### B. The Sixth Circuit's Panel Order

A little over a year after the petition for interlocutory review was granted, the Sixth Circuit issued its opinion holding that Mr. Hardwick lacked standing to bring his case. *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315 (6th Cir. 2023) ("Panel Order"). After reciting the familiar elements of standing, the Circuit Court explained that Hardwick "must show the existence of his own 'case or controversy' as to every defendant he has chosen to sue here." *Id.* (citing *Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284, 294 (6th Cir. 2023)). The Sixth Circuit "choose to begin and end [its analysis], however, with the element of traceability," that is the required "a showing that the plaintiff's 'injury was likely caused by the defendant'—or in this case, by each of the ten defendants." *Id.* at 320.

In framing the issue, the Sixth Circuit stated:

Hardwick's alleged injury, by his own account, is the presence of five particular PFAS compounds in his blood. He must therefore show that he has alleged facts plausibly supporting an inference that each defendant "likely caused" at least one of those PFAS compounds to end up in his blood.

*Id.* Mr. Hardwick had failed to carry his burden for two reasons, said the Court of Appeals. First, he and this Court had treated the defendants as a collective, rather than tying Mr. Hardwick's injury to each defendant. *Id.* Second, the Circuit Court found the traceability allegations in Mr. Hardwick's complaint to be conclusory. *Id.* at 321. Mr. Hardwick had failed to allege facts supporting a plausible inference that any of the defendants caused these five particular PFAS to end up in his blood:

To allege simply that these defendants manufactured or otherwise distributed

11

> "PFAS," therefore, is patently insufficient to support a plausible inference that any of them bear responsibility for the particular PFAS in Hardwick's blood. Yet nowhere in his complaint, for example, did Hardwick allege that any of these defendants, much less every one of them, manufactured any of those five compounds. Nor did he allege any plausible pathway by which any of these defendants could have delivered any of these five PFAS to his bloodstream. Instead, he simply alleged that "Defendants" manufactured and distributed "one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood[.]" That is a textbook example of the type of "the-defendant-unlawfully-harmed-me accusation" that the Supreme Court has found inadequate. [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)].

*Id.* The Circuit Court vacated this Court's class certification order and remanded the case with instructions to dismiss the case for lack of standing. *Id.* Upon return of the mandate, this Court dismissed the case for lack of jurisdiction. *Hardwick I*, ECF No. 249.

* * *

With that abridged version of the history of *Hardwick I*, the Court turns to the instant Motions and, guided by precedent, endeavors to determine whether Mr. Hardwick's new Complaint withstands Defendants' new Motion to Dismiss.

## ANALYSIS

As a preliminary matter, Defendants have filed an Unopposed Motion for Leave to File *Instanter* Notice of Supplemental Authority. (ECF No. 53.) Defendants ask the Court to consider *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which was issued by the United States Supreme Court last summer and limits the scope of a district court's equitable authority. (*Id.* PageID 1021.) Defendants cite Local Civil Rule 7.2(a)(2), which permits additional memoranda "upon leave of court for good cause shown." (*Id.* PageID 1020.) They assert their Unopposed Motion is supported by good cause and granting the Motion will not cause Mr. Hardwick prejudice. (*Id.*) They reinforce their asserted good cause by explaining *CASA* was decided after the parties had fully briefed the Motion to Dismiss and urging that it is "directly relevant to the Court's

12

resolution of" the Motion to Dismiss. (*Id.* PageID 1021.)

The Unopposed Motion (ECF No. 53) is **GRANTED** for good cause shown. The Court's grant of the Motion, however, is in no way an indication of the Court's view on the applicability of *Trump v. CASA*. The Court turns next to the briefing on the Motion to Dismiss.

## I. What the Court Can Consider

The parties argue about which materials the Court can consider when deciding this Motion to Dismiss. (*See* Resp., ECF No. 36, PageID 782–87; Reply, ECF No. 43, PageID 849–50; *see also* ECF No. 44.) The objects of this disagreement are the transcript from Mr. Hardwick's deposition taken more than four years ago, a June 2022 National Academy of Sciences report ("NAS Report"), and a 2024 United States Center for Disease Control/Agency for Toxic Substances and Disease Registry report ("CDC Report"). (Resp., PageID 782; ECF No. 31-1.)

Mr. Hardwick argues these materials were improperly attached to Defendants' Motion to Dismiss and should be stricken, or the Court should decline to consider them when deciding the Motion. (Resp., PageID 782–83.) Mr. Hardwick asserts that matters outside the pleadings are only properly considered where they are referred to in a complaint or central to the claims in the complaint. (*Id.* PageID 783 (citing *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011)).)

### A. Mr. Hardwick's Deposition Transcript from *Hardwick I*

Beginning with his previous deposition transcript, Mr. Hardwick states that he does not refer to his previous deposition transcript or any statements from the transcript in his Complaint. (Resp., PageID 783.) It is not central to his claims, he says. (*Id.*) Mr. Hardwick urges that if the Court does choose to consider any of the deposition testimony, Defendants have "grossly

mischaracterized and falsely represented that testimony." (*Id.* PageID 783–84.) Mr. Hardwick corrects what he says are incorrect mischaracterizations and representations. (*Id.* PageID 784.)

Defendants reply that Mr. Hardwick's deposition transcript was referenced in his Complaint. (Reply, PageID 849 (citing Compl., ¶ 2).) Defendants also argue that Mr. Hardwick's deposition transcript was filed on the public docket in *Hardwick I*, and so is a matter of public record that can be considered at the Federal Rule of Civil Procedure 12(b) stage. (*Id.* (citing two cases).)

The Court will not consider Mr. Hardwick's deposition transcript now. First, Mr. Hardwick's reference to the transcript in paragraph two of his Complaint is cursory. When discussing *Hardwick I*, he explains:

> Following full, complete briefing and oral argument on dispositive motions by the same Defendants herein, all of which were denied, and the close of class certification discovery, including the extensive, complete deposition of Plaintiff by the same Defendants herein, this Court issued an Opinion & Order on March 7, 2022, certifying Plaintiff and undersigned counsel to represent a class in the Original Case.

(Compl., ¶ 2.) That is the extent of the reference. The prior deposition transcript is not central to Mr. Hardwick's claims.

Next, the cases Defendants cite to support the proposition that the Court can consider matters of public record at the Rule 12(b) stage are inapposite. One case cited is from the Eastern District of Tennessee (and so not binding on this Court) and involved a *pro se* plaintiff and an estate dispute. *See Green v. Green*, No. 1:14-CV-43, 2015 WL 1206690, at *6 (E.D. Tenn. Mar. 16, 2015). That Court considered the plaintiff's prior litigation when deciding motions to dismiss and motions for summary judgment. *Id.* The other case is from the Southern District of Ohio and simply restates the *Rondigo* test, which is unpersuasive because Mr. Hardwick's deposition transcript is referenced in his Complaint only in a perfunctory manner and is not central to his

claims. *See Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 746 (S.D. Ohio 2020) (Black, J.) ("These materials include exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.") (citation modified).

Thus, the Court does not consider Mr. Hardwick's prior deposition transcript when deciding the Motion to Dismiss.

### B. NAS and CDC Reports

As for the NAS and CDC Reports, Mr. Hardwick argues the reports are not central to his Complaint because he references them each only one time in the 42-page, 183-paragraph document. (Resp., PageID 783.) Like his deposition testimony, Mr. Hardwick urges that if the Court does consider the Reports, it should also consider the additional context and characterization of the Reports provided by Mr. Hardwick in his response. (*Id.* PageID 785–87.)

Defendants reply that the Reports are referred to in the Complaint and are central to the claims contained therein—specifically, "that exposure to C8 supposedly warrants medical monitoring in certain circumstances"—so should be considered. (Reply, PageID 849.)

The Reports are a closer call than the deposition transcript, given the following allegations in Mr. Hardwick's Complaint:

> 82. The expanding awareness of the body of adverse health impact data for C8 also prompted the National Academy of Sciences to release a report in June 2022 indicating that medical monitoring would be appropriate for any person in the United States with more than 2 ppb total PFAS in their blood, with even more monitoring potentially being recommended for even more severe health impacts if total PFAS blood levels exceeded 20 ppb.
>
> . . . .
>
> 84. In 2024, the United States Center for Disease Control ("CDC") also released

15

guidance recommending that testing and monitoring be considered by doctors for individuals anywhere in the United States with C8 in their blood.

(Compl., ¶¶ 82, 84.) Medical monitoring is the central relief sought by Mr. Hardwick. Both reports discuss medical monitoring and when it is recommended and appropriate. As such, the Court considers the Reports to the extent necessary when deciding the Motions to Dismiss.

## II.     Oral Argument Request

Defendants and Mr. Hardwick request oral argument in the captions of their respective briefs. (Mot., ECF No. 32, PageID 598; *see also* ECF No. 31; Resp., PageID 757.) Local Civil Rule 7.1(b)(2) provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. Rule 7.1(b)(2). This case deals with issues of public importance—particularly given the putative class would be comprised of many citizens—as well as complex legal issues. Nevertheless, the Court has analyzed the parties' briefs and is quite familiar with this dispute after presiding over it for more than seven years. The Court held oral argument in *Hardwick I* and deems it unnecessary here. *See Whitescarver v. Sabin Robbins Paper Co.*, No. C-1-03-911, 2006 WL 2128929, at *2 (S.D. Ohio July 27, 2006) (Dlott, C.J.) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

## III.     Rule 12(b)(1) Motion

Standing is a threshold question because it is a prerequisite to jurisdiction. Panel Order at 319; *Henry v. Blank*, 167 F.4th 375, 380 (6th Cir. 2026). The Court begins with the threshold question.

Under Article III of the United States Constitution, federal courts are limited to hearing "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing is one such

16

limitation on that authority. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (citing *Carney v. Adams*, 592 U.S. 53, 58 (2020)). To sufficiently plead standing, Mr. Hardwick must illustrate (1) an injury in fact that is concrete and particularized and actual or imminent (rather than conjectural or hypothetical) (2) fairly traced to Defendants and (3) likely be redressed by a decision in his favor. 23(f) Order at *4; Panel Order at 319 (restating the same elements and citing *Lujan*, 504 U.S. at 560). A plaintiff's injury is fairly traceable to the challenged action of the defendant if there is a causal connection between the injury and the complained-of conduct. *Dep't of Educ.*, 600 U.S. at 561.

A plaintiff bears the burden of establishing these elements, "with the manner and degree of evidence required at the successive stages of the litigation." *Ward v. J.M. Smucker Co.*, No. 24-3387, 2025 WL 2613489, at *1 (6th Cir. Sept. 10, 2025) (citing *Lujan*, 504 U.S. at 560–61). "A plaintiff's burden at the pleading stage is to plausibly claim standing." *Id.* (citing *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021)). "Where there is a facial attack on the pleadings for lack of standing," courts must accept all factual allegations in the Complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at *2 (*Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019)).

Defendants assert that Mr. Hardwick lacks standing because he does not "plausibly allege a cognizable injury in fact" and his requested relief "would not redress his purported injuries." (Mot., PageID 610.) Although Defendants do not challenge traceability (*see id.* PageID 602), the Court addresses the traceability element first because, as stated above, whether this Court has the power to adjudicate this suit is a threshold question and so the Court must be satisfied this element is met. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

17

### A. Traceability

Mr. Hardwick says he has resolved the issues identified by the Sixth Circuit's Panel Decision and that his blood "contains the C8 manufactured by Defendants." (Compl., ¶ 3.) In *Hardwick I*, he sued 3M, DuPont, Chemours, Archroma Management L.L.C., Arkema, Inc., Arkema France, S.A., Daikin Industries Ltd., Daikin America, Inc., Solvay Specialty Polymers, USA, L.L.C., and Asahi Glass Company, Ltd. *Hardwick I*, ECF No. 1. In this litigation, he has dropped the last seven defendants named in *Hardwick I*.

As for 3M, Mr. Hardwick alleges it made its C8 "using its own patented electrochemical fluorination process, which generated C8 with a distinct chemical signature or 'fingerprint' identifiable by scientists using complex analytical techniques." (Compl., ¶ 14.) The Complaint continues:

> 15. 3M is the source of all PFOS found in human blood within the United States, including in Plaintiff and all Class members, and analytical testing can confirm that 3M is the sole source of all PFOA found in human blood, including in Plaintiff and all Class members, generated from the ECF method used and patented by 3M (the "3M ECF-Made PFOA"), based on branched versus linear chain results.
>
> 16. 3M designed, manufactured, marketed, used, sold, and released C8, including in Ohio and this District, in such a way as to result in the manufacture, use, disposal, and release of various products and materials containing or contaminated with C8 across the United States, including in Ohio, resulting in the release of C8 into the air, water, and soil where such C8 then traveled through the air, water, and otherwise across the country, including into Ohio, where such C8 then inevitably was either ingested, inhaled, adsorbed or otherwise entered the bodies and blood of humans exposed to such C8, proximately resulting in the contamination of Plaintiff's and the other Class members' blood and bodies with C8, and the biopersistence and bioaccumulation of such C8 in such blood and bodies.
>
> 17. All of the PFOS and all of the 3M ECF-Made PFOA in the blood of Plaintiff and all Class members came from 3M and is directly traceable to 3M. The blood of Plaintiff and all Class members contain PFOS and 3M ECF-Made PFOA that came from 3M.

(Compl., ¶¶ 15–17.) At this stage, Mr. Hardwick's burden is to plead facts that allow the Court to

18

draw the reasonable inference that 3M is liable for the misconduct alleged. *Ashcroft*, 556 U.S. at 677–78; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint includes sufficient allegations that Mr. Hardwick's alleged injury—ongoing intrusion into his blood and increased risk of disease as a result, as discussed further below—can be fairly traced to Defendant 3M.

Mr. Hardwick's traceability allegations with respect to DuPont and Chemours are similarly adequate. He alleges DuPont purchased PFOA from 3M for use in manufacturing Teflon™ at its Washington Works Plant and that residual PFOA was in and on consumer products like Teflon™ cookware. (Compl., ¶ 21.) He alleges PFOA was also released in the air, water, and soil from the Washington Works Plant and its associated landfills and disposal sites. (*Id.*) PFOA eventually made its way to his and the putative class members bodies and blood, says Mr. Hardwick. (*Id.*)

Mr. Hardwick describes DuPont's other consumer products in detail. (*Id.* ¶¶ 22–26.) He recounts how DuPont began making its own PFOA at plants when 3M stopped, and how the PFOA released and discharged from those plants made its way to his blood and the blood of the putative class members. (*Id.* ¶¶ 28–30.) Like 3M, "DuPont developed its own telomerization method for manufacturing PFOA and other materials that break down into, degrade to, or otherwise result in the release of PFOA" and the method generates "PFOA with a distinct chemical signature or 'fingerprint' identifiable by scientists." (*Id.* ¶ 31.)

As for Chemours, among other allegations, Mr. Hardwick alleges Chemours assumed or is otherwise responsible for DuPont's PFOA-liabilities, "including DuPont's liability for contaminating Mr. Hardwick's and the other Class members' blood and bodies with PFOA." (*Id.* ¶ 34.) He alleges that Chemours "continues to this day to manufacture PFAS and other materials

19

that result in the continuing release of PFOA into the environment." (*Id.* ¶ 35.) Because it finds the traceability allegations against DuPont sufficient, the Court also finds them sufficient against Chemours.

### B. Injury in Fact

Defendants argue that Mr. Hardwick has no certainly impending future injury as required by Article III due to PFAS in his blood. (Mot., PageID 602.) They urge that "[o]ver five-and-a-half years after filing *Hardwick I* based on PFAS exposures during decades of work as a firefighter and otherwise, Hardwick still does not allege that he is suffering from any concrete, present illness or condition attributable to PFOA or PFOS"—a point they say Mr. Hardwick concedes. (*Id.* PageID 611.) They argue Mr. Hardwick's allegations that C8 is in his blood are insufficient because, in the toxic-tort context, where an unwanted substance is in one's body, there is no injury in fact where the plaintiff does not allege to have suffered any adverse health consequences. (*Id.* PageID 611–12.)

Mr. Hardwick responds that "Defendants inflicted [him] with an injury by intruding on perhaps the oldest legally protected interest: his right to bodily integrity." (Resp., PageID 787.) He contends, "Defendants' intrusion into [his] blood is ongoing, and he faces a significantly increased risk of disease as a result." (*Id.*) Mr. Hardwick asks this Court not to deviate from its prior reasoning—the Court got it right the first time in its opinion and order on the motions to dismiss in *Hardwick I*. (*Id.* PageID 788–90); *Hardwick v. 3M Co.*, No. 2:18-CV-1185, 2019 WL 4757134, at *7 (S.D. Ohio Sept. 30, 2019) ("*Hardwick I* MTD Opinion"). Mr. Hardwick also asserts that in its 23(f) Order, the Sixth Circuit acknowledged that he may have satisfied the injury-in-fact showing. (*Id.* PageID 790; 23(f) Order, at *5.)

Article III requires an injury to be "concrete, particularized, and actual or imminent."

20

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). While the "most obvious [injuries] are traditional tangible harms, such as physical harms and monetary harms," intangible harms can also be concrete, such as "intrusion upon seclusion." *Id.* at 423–25.

In the *Hardwick I* MTD Opinion, this Court relied on *Hirsch v. CSX Transp., Inc.,* No. 1:07-cv-3512, slip op. (N.D. Ohio Oct. 22, 2008) and *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011) to support its reasoning. *Hardwick I* MTD Opinion, at *6–9 (characterizing *Hirsch* as "on point and binding"). Specifically, this Court concluded that "Mr. Hardwick ha[d] alleged injury sufficient to state a claim of negligence and/or battery," and

> comparable to the 'no injury' *Hirsch* plaintiffs, Mr. Hardwick allege that PFAS are toxic substances . . . that the PFAS were released into Ohio because of Defendants' acts and/or omissions, that he was exposed to PFAS because of Defendants' conduct, that PFAS is associated with increased risk of disease in humans, that each Defendant's conduct caused him to be exposed to these toxic substances in Ohio, and that he now faces an increased risk of disease requiring medical monitoring and scientific research.

*Id.* at *9.

But in granting the petition to appeal under Rule 23(f), the Sixth Circuit found that this Court's conclusion that *Hirsch* was on point and binding was "open to doubt":

> As to *Hirsch*, which involved a chemical leak from a train derailment, our decision never resolved (or even discussed) whether the plaintiffs' exposure to toxic fumes constituted an Article III injury in fact. *See generally Hirsch*, 656 F.3d at 359. Moreover, we affirmed the district court's grant of summary judgment to the defendants on the ground that the exposure so minutely increased the plaintiffs' risk of disease that no reasonable physician would order medical monitoring under the circumstances. *Id.* at 364. True, our decision to reach the merits may implicitly suggest that we believed the exposure an injury in fact. But as the Supreme Court has made clear, glossing over jurisdiction is not a holding on jurisdiction. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011); *see also Hagans v. Lavine*, 415 U.S. 528, 535 n.5 (1974). And it may be telling as well that we considered the plaintiffs' exposure to the fumes such a *minimis* injury that summary judgment was warranted for the defendants. *Hirsch*, 656 F.3d at 364. Thus, as to Article III standing, it is unclear why *Hirsch* is "binding" or even "on point."

23(f) Order, at *4.

21

This language casts doubt on this Court's finding in *Hardwick I* that Mr. Hardwick had sufficiently alleged an injury in fact, but the 23(f) panel did not decide the question. Mr. Hardwick reminds the Court of the other cases cited in its *Hardwick I* MTD Opinion other than *Hirsch*. (Resp., PageID 789.) This Court explained that "[t]he Sixth Circuit has since then relied upon *Hirsch* and *Brush Wellman* for the proposition that medical monitoring is an available remedy in a tort action under Ohio law." *Hardwick I* MTD Opinion, at *9 (citing *Baker v. Chevron U.S.A. Inc.*, 533 Fed. Appx. 509, 517 (6th Cir. 2013)). *See also Wilson v. Brush Wellman, Inc.*, 817 N.E.2d 59 (Ohio 2004). Neither *Brush Wellman* nor *Baker v. Chevron* was discussed in the 23(f) Order.

In *Brush Wellman*, the Supreme Court of Ohio considered "whether class certification under [Ohio Rule of Civil Procedure 23(B)(2)] [was] proper in an action seeking to establish a medical-monitoring fund" and found that the plaintiffs had failed to meet the cohesiveness requirement of the Rule. 817 N.E.2d at 61. In that case, the plaintiffs were all employed at various times in the 1950s through the 1990s by contractors at the Brush Wellman Elmore plant, where beryllium alloy was produced for use in industrial applications. *Id.* As the plaintiffs alleged, they were exposed to beryllium dust and fumes that were generated by manufacture of the alloy, and beryllium exposure could cause a lung ailment called chronic beryllium disease and other ailments. *Id.* "Some individuals may never show symptoms or develop any disease, while others can have serious impairments or even die as a result of their exposure." *Id.*

Among other findings in *Brush Wellman*, the Supreme Court of Ohio adopted a "bright-line test" to determine whether requested medical-monitoring relief was injunctive in nature: "Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive." *Id.* at 65. *Brush Wellman* supports the

22

conclusion that Ohio law recognizes that exposure to a toxic substance that increases one's risk of disease constitutes an injury because the Supreme Court of Ohio could not have adopted a bright line test or concluded that medical monitoring could be a form of injunctive relief otherwise.

*Baker v. Chevron* dealt with benzene contamination from seeping fuel. 533 Fed. Appx. at 511–12. Over 55 years, roughly 8 million gallons of fuel had leaked from a crude oil refinery near Hoover, Ohio. *Id.* at 512. Chevron began remediation and by 2006, the Environmental Protection Agency and Ohio Department of Health had found no ongoing health risks. *Id.* at 512–13. Two hundred residents filed a mass tort suit alleging Chevron's emissions and contamination caused personal injury, property damage, and heightened health risks requiring medical monitoring. *Id.* at 511, 513. Ultimately, the district court granted summary judgment for Chevron on all claims. *Id.* at 511–16; *see Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 768 (6th Cir. 2025) (summarizing *Baker v. Chevron*).

In *Hardwick I*, this Court relied on this paragraph in *Baker v. Chevron* acknowledging a medical monitoring claim:

> As this court explained in *Hirsch*, in accordance with *Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994) [(Spiegel, J.)] and *Wilson v. Brush Wellman, Inc.*, 103 Ohio St.3d 538, 817 N.E.2d 59 (2004), "medical monitoring" is a remedy for being presently injured with an "increased risk of—and corresponding cost of screening for—certain diseases that . . . are more likely to occur as a result of [a defendant's tortious conduct]." *Hirsch*, 656 F.3d at 363.

*Baker v. Chevron*, 533 F. App'x at 525; *see Hardwick I* MTD Opinion, at *9.

*Brush Wellman*, *Baker v. Chevron*, and *Day* and other cases indicate that an increased risk of disease from toxic chemical exposure can constitute a present injury under Ohio law.[2] *See*

---

[2] Despite Mr. Hardwick's class action allegations in the Complaint, which state that he is bringing the "lawsuit as a class action on behalf of the following nationwide Class, . . .

*also Ward*, 2025 WL 2613489, at *2 ("We have held that an increased risk of illness can constitute injury-in-fact." (citing *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 571–75 (6th Cir. 2005)); *In re E. Palestine Train Derailment*, No. 4:23CV0242, 2024 WL 1096062, at *21–22 (N.D. Ohio Mar. 13, 2024) (on motions to dismiss, finding plaintiffs had pleaded sufficiently exposure to hazardous materials which caused such an increased risk of disease such that a reasonable physician would order medical monitoring); *Allen v. Wenco Mgmt., LLC*, 696 F. Supp. 3d 432, 438 (N.D. Ohio 2023) (explaining that the Ohio Supreme Court has "blessed" a medical monitoring claim "under the proper circumstance"). *Ward*, *In re E. Palestine Train Derailment*, and *Allen* were all issued after the 23(f) Order.

Mr. Hardwick asserts that the Sixth Circuit "agreed" in the 23(f) Order that "Ohio's recognition of a cause of action for medical monitoring claims after exposure to toxic substances may be probative that such injury constitutes an injury in fact' for Article III standing purposes, . . . especially when the asserted injury 'has a close historical analogue." (Resp., PageID 789.) The Sixth Circuit finished that thought, however, with: "But as the Supreme Court has explained, a legislature's recognition of a cause of action is not itself dispositive that the asserted injury is cognizable under Article III." 23(f) Order, at *5. To be sure, the Sixth Circuit doubted Mr. Hardwick's case in *Hardwick I* in the 23(f) Order. Yet, the panel that decided the 23(f) Order did not decide the merits of the standing challenge to Mr. Hardwick's case. The panel found further review was warranted and granted defendants' petition to appeal under Federal Rule of Civil Procedure 23(f). Put differently, the 23(f) Order panel doubted Mr.

---

Individuals subject to the laws of Ohio, or subject to the laws of any other state that recognizes the claims for relief filed by Plaintiff" (Compl., ¶ 131), the parties cite and discuss Ohio law only. The Court follows suit, with the caveat that this Opinion does not examine or opine on if Mr. Hardwick has sufficient standing to bring similar claims under the law of any state other than Ohio because the parties did not advance such arguments.

24

Hardwick had adequately shown the elements of standing but did not decide the issue.

Defendants urging that Mr. Hardwick's future injury is not "certainly impending" does not convince the Court that it should reach a different outcome. (Mot., PageID 611 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).) Case law supports the conclusion that Mr. Hardwick is presently injured—he has C8 in his blood, and that C8 exposes him to an increased risk of disease. In other words, his alleged injury is not a future injury, it is that he is already injured. Mr. Hardwick fervently argues this point, reminding that "[t]he right to bodily integrity is so fundamental that the unlawfulness of intruding upon it has always been obvious and well understood." (Resp., PageID 791 (citing *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019).) *See Day*, 851 F. Supp. at 878 ("[O]nce a plaintiff ingests a harmful contaminant, they have suffered a 'technical' physical injury, even though the Plaintiffs have not yet suffered from actual disease."). "C8 is *already* present and persisting in Mr. Hardwick's blood and *already* causing concrete, current subcellar changes and other injury," says Mr. Hardwick. (Resp., PageID 793 (emphasis in original) (citing Compl., ¶¶ 8, 57–61, 72, 99–100, 138, 143, 181).) The Court finds these allegations to be sufficient.

Mr. Hardwick also alleges that the C8 present in his blood and body already exceed levels scientist determined to be safe and certain scientists have publicly recommended medical monitoring given those levels. (*Id.* (citing Compl., ¶¶ 8, 72–85, 138, 143, 181).) At the pleading stage, Mr. Hardwick need not prove or introduce evidence of increased risk of harm to confer standing; he need only plead increased risk of disease. *Sutton*, 419 F.3d at 573 n.5 ("[W]e again note that specific evidence of the alleged increased risk of harm is not a requirement to confer standing."); *In re E. Palestine Train Derailment*, 2024 WL 1096062, at *21 n.16 (explaining that while expert medical testimony is required to demonstrate increased risk of disease, "[e]xpert

25

proof, however, is better reserved for summary judgment and trial and not the pleading stage of litigation" and the plaintiffs did not need to prove anything or present sufficient evidence at the motion to dismiss stage). At this stage, this Court cannot attempt to evaluate the merits of Mr. Hardwick's "contention that he is entitled to medical monitoring"; during "the threshold standing inquiry," this Court must accept Mr. Hardwick's allegations as true and construe the Complaint in Mr. Hardwick's favor. *Sutton*, 419 F.3d at 571. Doing so, the Court finds Mr. Hardwick has sufficiently pled an injury in fact.

### C. Redressability

Defendants next argue that "Mr. Hardwick lacks standing because he alleges nothing showing that his required remedy—a Science Panel and medical monitoring—would redress his alleged injuries." (Mot., PageID 602–03, 616.) Relying on the 23(f) Order, Defendants urge that even assuming the PFAS-in-the-blood theory supports an injury in fact, "studies and monitoring would not eliminate the PFAS from his blood." (*Id.* PageID 616 (citing 26(f) Order, at *5).) Nor would the medical monitoring and studies prevent more PFAS from entering Mr. Hardwick's blood again, Defendants say. (*Id.* (citing 26(f) Order, at *5).)

Defendants also argue that the Complaint does not contain necessary allegations about how Mr. Hardwick's requested relief would ameliorate any C8-related health risks faced by Mr. Hardwick. (*Id.* PageID 617.) Defendants state that Mr. Hardwick's "only allegations about recommended PFAS-related monitoring for which Hardwick could potentially qualify concern 'usual standard of care' monitoring of cholesterol levels." (*Id.*) But he is already monitoring his cholesterol—Defendants urge, relying on Mr. Hardwick's previous deposition testimony—and so medical monitoring would have "no ameliorative effects on" any risk of future injuries. (*Id.* (quoting *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540).) "Nor can Hardwick satisfy the

26

redressability requirement by pointing to the supposed possibility that the requested Science Panel might someday find that his alleged exposures place him at risk of some other illness or condition for which the Science Panel deems monitoring appropriate." (*Id.* PageID 617.) That is too speculative, Defendants say. (*Id.* PageID 618.)

Mr. Hardwick responds that Defendants' redressability arguments depend on the assumption that his injury is the "mere presence" of C8 in his blood. (Resp., PageID 797.) But Mr. Hardwick frames his injury as "the presence of C8 in the blood, *coupled with* its unique persistence bioaccumulation, and toxicity that also creates a continuing, significantly increased risk of serious disease, including cancer" (and the Court agreed with that framing in the Injury in Fact Section above). (*Id.* (emphasis in original).) So the redressability issue is not simply whether monitoring can remove the C8, or eliminate or prevent it, but if medical monitoring can "redress the harm associated with the ongoing, continuing threat of a significantly increased risk of serious disease associated with the C8 in the blood." (*Id.*) Mr. Hardwick asserts that medical monitoring and studies would redress his injury by "providing information and data" that he "could use in discussions with his doctor . . . to further investigate, prepare for, and minimize the risks of disease arising from his C8 exposures." (*Id.*)

"An injury is redressable if a court order can provide 'substantial and meaningful relief.'" *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 715 (6th Cir. 2015) (quoting *Larson v. Valente*, 456 U.S. 228, 243 (1982)). Redressability is satisfied if a plaintiffs can show that "a favorable decision will relieve a discrete injury to himself." *Id.* (quoting *Larson*, 456 U.S. at 244 n.15). "He need not show that a favorable decision will relieve his *every* injury." *Id.* (emphasis in original). Likelihood is the standard—whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't*

*Services (TOC) Inc.*, 528 U.S. 167, 181 (2000).

The parties agree that scientific testing will not remove C8 from Mr. Hardwick's blood. Nor will it prevent C8 from entering Mr. Hardwick's blood again. The Sixth Circuit explicitly noted this in the 23(f) Order. 23(f) Order, at *5.

Mr. Hardwick's position, though, is that he has adequately alleged that medical monitoring and studies are likely to redress part of his injuries, and that is enough. He says such a remedy "would . . . undoubtably help to remedy [his] ongoing injury because providing such relief would not only provide [him] (and his doctors/medical professionals) with crucial information and data necessary to combat and minimize his future risk of disease but would also help redress the past battery he suffered." (Resp., PageID 798 (citing *Lambert v. Hartman*, 517 F.3d 433, 438 (6th Cir. 2008)).)

The Court agrees. Here at the pleading stage, it is enough that Mr. Hardwick's requested equitable and injunctive relief would make sure he receives a medical response to Defendants' "invasion of [his] bodily integrity." (*See* Resp., PageID 799). *See Doe v. DeWine*, 910 F.3d 842, 850–51 (6th Cir. 2018) (holding that a plaintiff's requested relief, even if not a complete remedy for the plaintiff's injury, establishes redressability where the relief would "remove one barrier" to the plaintiff obtaining that remedy).

Defendants' argument about Mr. Hardwick already monitoring his cholesterol is not persuasive. As the Court explained above, it does not consider Mr. Hardwick's deposition testimony from *Hardwick I*. The Court is not persuaded that Mr. Hardwick's requested relief is too speculative because the medical monitoring could identify "someday" "some other illness or condition," particularly at the pleading stage. (Mot., PageID 617–18.) As Mr. Hardwick pleads and explains, early detection and treatment for a toxic substance injury can ameliorate increased

28

risk of developing multiple diseases, including cancer. (Compl., ¶¶ 65, 70, 73, 76, 82–84, 94, 100; Resp., PageID 799.) The *Day* Court succinctly explained how medical monitoring claim precipitated in toxic substance injury cases:

> In recent years medical science has come to understanding that certain exposures can cause a disease with a protracted latency period, which may not manifest itself for many years. Under these circumstances a prudent physician could order preventative measures and periodic future testing, in order to have the best opportunity for early detection and treatment of the full blown disease, if and when it might manifest itself. It is the combination of the traditional tort policy of compensation for reasonable diagnostic procedures and the medical understanding of diseases with protracted latency periods that have led courts to order prospective medical monitoring . . . .

*Day*, 851 F. Supp. at 880.

Mr. Hardwick has sufficiently pled his alleged injury in fact is redressable by a favorable decision of this Court. Defendants' Rule 12(b)(1) Motion is **DENIED**.

## IV.      Rule 12(b)(6) Motion

Many of Defendants' Rule 12(b)(6) arguments are the same as or similar to their Rule 12(b)(1) arguments. For example, Defendants correctly argue that an injury is a requirement for all three of Mr. Hardwick's claims under Ohio law—negligence, battery, and conspiracy. (Mot., PageID 618–19.) They cite Ohio case law favorable to their position that has rejected claims premised on allegedly toxic exposures that could alter a plaintiff's body or blood without causing identifiable illness or adverse effects. (*Id.* PageID 619–20.) They also re-argue the applicability of the reasoning in the 23(f) Order and the inapplicability of *Hirsch*. (*Id.* PageID 620–21.) The Court has addressed many of Defendants' injury-related arguments above when analyzing Mr. Hardwick's standing.

Defendants' other arguments for dismissal on the pleadings include:

- To survive, Mr. Hardwick's conspiracy claim must allege the existence of an unlawful act independent from the actual conspiracy and to the extent Mr.

Hardwick pleads a fraud claim, he has not met the particularity requirement of Federal Rule of Civil Procedure 9(b) (Mot., PageID 622–23);

- The conspiracy claim cannot be based on the tort of negligence because it is impossible to conspire to commit negligence (*id.* PageID 623);

- Mr. Hardwick's conspiracy allegations do not offer any facts to plausibly plead Defendants agreed to commit a battery against Mr. Hardwick (*id.*);

- Declaratory judgment is a form of relief, not a standalone claim, so that claim should be dismissed (*id.* PageID 623–24);

- The requested medical monitoring and Science Panel order "is not properly characterized as injunctive or other equitable relief," but a request for damages that is barred by the Ohio Product Liability Act (*id.* PageID 624–27); and

- This Court lacks authority to award equitable relief in the form of medical monitoring and a Science Panel because such relief "bears no resemblance to anything that court of equity could have awarded in 1789" (*id.* PageID 627–631).

Mr. Hardwick, not surprisingly, zealously opposes each of the above arguments and highlights that this Court decided many of the issues in *Hardwick I.* (Resp., PageID 801–18.) Defendants thoughtfully and thoroughly reply. (Reply, PageID 865–80.)

Yet, as discussed in the next Section, the Court is of the view that an immediate appeal of this Opinion and Order on standing is appropriate. If the Sixth Circuit agrees immediate appeal is warranted, but disagrees with this Court's standing analysis, then the Court has no subject matter jurisdiction to hear Mr. Hardwick's case. An opinion with that holding from the Sixth Circuit would moot Defendants' Rule 12(b)(6) Motion. If the Sixth Circuit agrees that an immediate appeal is warranted and agrees with this Court's standing analysis, then many of Defendants' Rule 12(b)(6) arguments would be unpersuasive. Finally, if the Sixth Circuit finds no immediate appeal is warranted, the Court will decide the Rule 12(b)(6) Motion thereafter, with much familiarity to the arguments therein.

Being mindful of obtaining an efficient and legally-sound disposition of this dispute, as

well as conserving judicial resources and party expenses in this litigation, the Court **HOLDS IN ABEYANCE** the Joint Motion Pursuant to Federal Rules of Civil Procedure 12(b)(6). (ECF No. 31.)

### IMMEDIATE APPEAL

28 U.S.C. § 1292(b), the statute that governs interlocutory decisions, states as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

This provision allows a district court to certify for immediate appeal an interlocutory order that (1) involves a controlling question of law, (2) as to which there is a substantial ground for difference of opinion, and (3) when an immediate appeal from the order may materially advance the ultimate termination of the litigation. *In re Salas*, 160 F.4th 810, 814 (6th Cir. 2025) (quoting 28 U.S.C. § 1292(b)).

"If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met," Federal Rule of Appellate Procedure 5(a)(3) state that the district court "may amend its order, either *on its own* or in response to a party's motion, to include the required permission or statement." If that happens, "the time to petition runs from entry of the amended order." Fed. R. App. P. 5(a)(3) (emphasis added); *see T.P. by & through S.P. v. Walt Disney Parks & Resorts U.S., Inc.*, 445 F. Supp. 3d 665, 668 (C.D. Cal. 2020) ("A district court may certify an order *sua sponte* or in response to a request from a party."); *Hampel v. Mecosta Cnty. Med. Ctr.*, No. 1:09-CV-219, 2011 WL

13354078, at *1 (W.D. Mich. Mar. 15, 2011) (explaining that "[t]he Sixth Circuit Court of Appeals has held that this statute requires three elements be present before a court may, in its discretion, certify an order for interlocutory appeal" and that "Federal Rule of Appellate procedure 5(a)(3) permits a district court to amend an order to include this language either *sua sponte* or upon motion by a party").

This matter involves a controlling question of law because subject matter jurisdiction "goes to the very power of a court to hear a controversy." *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 238 F. Supp. 3d 723, 732 (E.D. Pa. 2017).

Second, this case involves substantial ground for difference of opinion. The procedural posture is unique—this is a re-filed case involving a putative nationwide or Ohio class action. Presumably such a putative class would be large. In *Hardwick I*, this Court certified an Ohio class, described as follows: "Individuals subject to the laws of Ohio, who have 0.05 parts per trillion (ppt) of PFOA (C-8) and at least 0.05 ppt of any other PFAS in their blood serum." 23(f) Order, at *2. The parties agreed that class comprised of "at least about 11.8 million Americans who reside in Ohio." *Id.* In this re-filed action, Mr. Hardwick seeks to certify a class of individuals "subject to the laws of Ohio, or subject to the laws of any other state that recognizes the claims for relief filed by Mr. Hardwick, who have 2 parts per billion (2 ppb) or more of PFOA and PFOS (combined) manufactured by Defendants in their blood serum." (Compl., ¶ 131.) That is a smaller putative class—with a lower limit that is now 20,000 times greater in combined PFOA and PFOS blood serum amount—but still the Court presumes the class would be large if certified. Not surprisingly, then, this case has been zealously advocated on both sides. The parties have filed lengthy briefs in *Hardwick I* and here, requiring careful opinions and orders. The case law on standing and medical monitoring in Ohio and the Sixth Circuit is

32

complicated and subject to varying interpretations and outcomes, as shown by the opinions and orders here and in *Hardwick I* (in the District Court and Circuit Court).

While the Sixth Circuit's 23(f) Order casts doubt on Mr. Hardwick's standing, the Sixth Circuit only definitively decided the issue of traceability in the Panel Order, and the Court finds Mr. Hardwick has remedied the traceability issue in his re-filed Complaint. Yet this Court engaged in its standing analysis cautiously, navigating the law available and mindful of 23(f) Order. There is little doubt, however, that the case law indicates there is substantial ground for difference of opinion on the availability and boundaries associated with medical monitoring relief.

Third, if the Court's analysis above is incorrect and it does lack jurisdiction over this case, "continued litigation would waste time and resources by requiring the Court to render decisions that would ultimately be deemed void." *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 238 F. Supp. 3d at 732. The Court is mindful of the substantial time and resources the parties, the Court, and the Sixth Circuit have expended on this litigation. In *Hardwick I*, the parties briefed and argued motions to dismiss (which this Court denied by opinion), and then the parties engaged in class certification discovery, as well as briefing of a class certification motion. *See supra* Section II. This Court granted class certification by an approximately 50-page opinion. *See id.* Then, the Sixth Circuit issued two separate opinions on the interlocutory appeal of that opinion. *See* 23(f) Order, Panel Decision. All these opinions and orders discussed standing.

This recount of the history of this litigation is not meant to minimize the importance and seriousness of the allegations in Mr. Hardwick's operative Complaint. Rather, it is to show how important ensuring that this Court's standing analysis is proper before the litigation proceeds further, avoiding having the parties engage in unnecessary costly litigation and the Court expend

33

its limited judicial resources.

The Court acknowledges that "[r]eview under § 1292(b) is granted sparingly and only in exceptional cases," *In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002), yet respectfully suggests that this is an exceptional case as the Sixth Circuit has acknowledged previously. *See* 23(f) Order (explaining further review was warranted where the theory of standing was questionable and massive liability was threatened).

The Court certifies this matter for interlocutory review and stays this matter pending disposition of this recommendation.

**CONCLUSION**

Defendants' Unopposed Motion for Leave to File *Instanter* Notice of Supplemental Authority (ECF No. 53) is **GRANTED**. Defendants' Rule 12(b)(1) Motion to Dismiss is **DENIED** (ECF No. 31) and Defendants' Rule 12(b)(6) Motion to Dismiss is **HELD IN ABEYANCE** (ECF No. 31). The Court certifies this matter for interlocutory review. This case remains open but is stayed for now.

**IT IS SO ORDERED.**

**3/20/2026**                                              **s/Edmund A. Sargus, Jr.**
**DATE**                                                       **EDMUND A. SARGUS, JR.**
                                                                  **UNITED STATES DISTRICT JUDGE**

34
